NEGEV PHOSPHATES, LTD., Plaintiff,

v.

UNITED STATES DEPARTMENT OF COMMERCE and United States International Trade Commission, Defendants,

and

FMC Corporation and Monsanto Company, Defendants–Intervenors.

Court No. 87–09–00974.

United States Court of International Trade.

Nov. 8, 1988.

Kaplan, Russin & Vecchi, Dennis James, Jr. and Kathleen F. Patterson, Washington, D.C., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Civ. Div., Commercial Litigation Branch, U.S. Dept. of Justice, Platte B. Moring, III, Washington, D.C., for defendants.

Polina K. Smith, Washington, D.C., for U.S. Dept. of Commerce.

Lyn M. Schlitt, General Counsel, James A. Toupin, Asst. Gen. Counsel, and Mitchell Dale, Washington, D.C., for U.S. Intern. Trade Com'n.

Gibson, Dunn & Crutcher, Joseph H. Price and Josiah O. Hatch III, Washington, D.C., for defendants-intervenors.

DiCARLO, Judge:

Negev Phosphates, Ltd. (Negev) of Israel moves pursuant to Rule 56.1 of the Rules of this Court for judgment on the record and asks the Court to vacate an antidumping order and a countervailing duty order on industrial phosphoric acid from Israel. 52 Fed.Reg. 31,057 (Aug. 19, 1987).

The Court has jurisdiction under 28 U.S. C. § 1581(c) (1982). The Court finds both the final affirmative dumping determination of the International Trade Administration of the United States Department of Commerce (Commerce), *Final Determination of Sales at Less Than Fair Value; Industrial Phosphoric Acid From Israel,* 52 Fed.Reg. 25,440 (July 7, 1987), and the affirmative material injury determination of the United States International Trade Commission (Commission), *Industrial Phosphoric Acid From Belgium and Israel,* Invs. No. 701–TA–286 (Final) and 731–TA–365 and 366 (Final), USITC Pub. 2000 (Aug.1987), to be supported by substantial evidence on the administrative record as a whole and according to law. The imposition of the antidumping and countervailing duty orders is affirmed and this action is dismissed.

## BACKGROUND

### A. *The Merchandise*

Industrial phosphoric acid ($H_3PO_4$) is a relatively pure form of phosphoric acid produced in four acid grades: technical, food, ACS-semi, and polyphosphoric. Each grade has distinct uses. Technical grade acid is used in cleaners, cement processing, leather tanning, fire brick manufacturing, varnishes, rubber, and in downstream production of soaps, detergents, and water treatment. Food grade phosphoric acid is used in cola beverages, sugar refining, jam and jelly flavorings, yeast nutrients, and cottage cheese production. ACS-semi grade acid is used as a reagent in analytical chemistry, semi-conductor manufacture, and processing applications requiring high purity and low residue levels. Polyphosphoric grade acid is used as a catalytic

agent, a surfactant in oil drilling, and in manufacturing dyes and herbicides.

The imported industrial phosphoric acid is classifiable under item 416.30 of the Tariff Schedules of the United States. USITC Pub. 2000, at 1. Since January 1, 1987, the most-favored-nation column 1 duty rate has been "free." Imports of industrial phosphoric acid were previously eligible for duty-free entry under the Generalized System of Preferences (GSP) from January 1, 1976 to December 31, 1986. Israeli products received the GSP treatment prior to the granting of duty-free entry under the United States–Israel Free Trade Implementation Act of 1985. USITC Pub. 2000, at A–11.

### B. *The Petitions for Relief*

FMC Corporation and Monsanto Company (the "domestic industry") filed petitions with Commerce and the Commission alleging that imports of industrial phosphoric acid from Israel and Belgium were being sold in the United States at less than fair value and were also subsidized by the governments of Israel and Belgium and that these imports were causing material injury to a United States industry.

### C. *Commerce's Findings*

After full investigations, Commerce found that industrial phosphoric acid imported from Israel and Belgium was being sold in the United States at less than fair value. *Final Determination of Sales at Less Value; Industrial Phosphoric Acid From Israel,* 52 Fed.Reg. 25,440 (July 7, 1987); *Final Determination of Sales at Less Than Fair Value; Industrial Phosphoric Acid From Belgium,* 52 Fed.Reg. 25,436 (July 7, 1987). In the countervailing duty investigation, Commerce found that the Government of Israel was providing countervailable benefits to Israeli manufacturers, producers, or exporters of industrial phosphoric acid, *Final Affirmative Countervailing Duty Determination; Industrial Phosphoric Acid From Israel,* 52 Fed. Reg. 25,447 (July 7, 1987); but that the Kingdom of Belgium was not providing countervailable benefits to the Belgian in-

dustry, *Final Negative Countervailing Duty Determination; Industrial Phosphoric Acid From Belgium,* 52 Fed.Reg. 25,443 (July 7, 1987).

### D. The Commission's Findings

The Commission majority determined that imports of industrial phosphoric acid from Israel found to be subsidized and sold in the United States at less than fair value, cumulated with the volume of industrial phosphoric acid from Belgium sold in the United States at less than fair value, are causing material injury to a domestic industry. *Industrial Phosphoric Acid from Belgium and Israel,* USITC Pub. 2000 (Aug.1987). Negev petitioned the Commission to reconsider its determination because the domestic industry announced price decreases shortly after the Commission issued its final affirmative injury determination. The Commission denied Negev's petition for reconsideration.

### STANDARD OF REVIEW

The Court is directed to hold unlawful final affirmative determinations of Commerce or the Commission if either determination is not supported by substantial evidence on the record as a whole or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982); *Washington Red Raspberry Comm'n v. United States,* 859 F.2d 898 (Fed.Cir.1988) (Commerce); *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 132, 744 F.2d 1556, 1559 (1984) (Commission). Substantial evidence on the record as a whole does not mean a large or considerable amount of evidence but rather "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* — U.S. —, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). Substantial evidence is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *ICC Indus. v.*

*United States,* 812 F.2d 694, 699 (Fed.Cir. 1987). However, the traditional deference courts pay to an agency's interpretation of a statute is not to be applied to alter the clearly expressed intent of Congress, *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986); nor is the Court to defer to decisions which are based on inadequate analysis or reasoning, *USX Corp. v. United States,* 11 CIT —, 655 F.Supp. 487, 492 (1987). It is not the court's function, however, to decide that it would have made another decision on the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States,* 3 Fed.Cir. (T) 44, 54, 750 F.2d 927, 936 (1984). Rather, the court will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence. *Universal Camera Corp. v. National Labor Relations Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1950); *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994 (Fed.Cir.1986); *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 136, 744 F.2d 1556, 1563 (1984).

### DISCUSSION

Negev challenges (I) Commerce's refusal to make a circumstance of sale adjustment in its final determination of sales at less than fair value and (II) the Commission's (A) findings on volume of imports, (B) refusal to cumulate prices, and (C) acceptance of testimony on lost sales and underselling.

### I. Commerce's Denial of a Circumstance of Sale Adjustment

Commerce denied Negev's claim for a circumstance of sale adjustment for payments made under an Exchange Rate Risk Insurance Scheme (EIS).

During the investigation, Commerce asked Negev to "explain the type of adjustment claimed for EIS rebates." R. 488 (supplemental questionnaire). Negev responded that:

On the U.S. sales reported, [Negev] received insurance rebates to account for *differences in exchange rates vis a vis inflation.* Sales to the local market are not included in the exchange rate insurance. Take out: Local sales which instead would have been exported would have received according to the actual results [confidential] positive payment. We do not want to show the [confidential] figure.

R. 520; Conf.R. 377 (emphasis added). Commerce also asked Negev:

How is the EIS rebate amount determined? Are any premiums paid by [Negev] accounted for? Will the EIS payment for the second necessarily be the same as the first on a per M/T [metric ton] basis? Explain fully.

R. 488. To these questions Negev responded:

The EIS rebate is determined by the *difference between the movement of the exchange rate of a basket of currencies and local inflation.*

Our calculations include are after deducting the premium paid.

On a per ton basis, the receipt would be the same for each sale to the U.S. during a time period when the results of the EIS are the same, and the price received is the same, the EIS received would be the same per ton.

R. 520 (emphasis added).

Commerce denied Negev's claimed adjustment for EIS receipts. Commerce's preliminary determination stated that "[p]articipation in the EIS is an overall management technique to safeguard against currency fluctuations. As such, indemnity payments resulting from the program do not qualify as directly-related expenses under [19 C.F.R. § 353.15]." *Preliminary Determination of Sales at Less Than Fair Value; Industrial Phosphoric Acid From Israel,* 52 Fed.Reg. 12,-952, 12,952–53 (Apr. 20, 1987). In its final dumping determination, Commerce described EIS payments as representing "compensation for foreign exchange losses" which Negev incurred between the date of each United States sale and the date of payment. 52 Fed.Reg. at 25,441. Because Commerce determines the United States price

as of the date of sale and, thus, before it becomes affected by such losses resulting from the devaluation of the local currency relative to the currency of the outstanding foreign receivables, no adjustment for EIS receipts is appropriate. Similarly, the absence of EIS receipts for the sales in the home market does not represent a circumstance of sale expense because sales in the home market are made in local currency and are not subject to foreign currency fluctuations.

52 Fed.Reg. at 25,441. Commerce thus determined that the EIS payments did not qualify as "directly related" expenses under 19 C.F.R. § 353.15 and consequently denied the circumstance of sale adjustment. *Id.* While Commerce denied a circumstance of sale adjustment, Commerce did reduce Negev's antidumping duty deposit rate from 6.62 percent to 1.77 percent to represent the countervailable benefit of the EIS payments to Negev. Commerce reasoned that because "antidumping duties cannot be assessed on the portion of the margin attributable to export subsidies, there was no reason to require a cash deposit for that amount." *Antidumping Duty Order; Industrial Phosphoric Acid From Israel,* 52 Fed.Reg. 31,057, 31,057 (Aug. 19, 1987).

At oral argument Commerce conceded that its description in the antidumping duty investigation mischaracterized the EIS program because the record shows that Negev did not actually incur any foreign exchange rate losses on either of the two verified sales made during the period of investigation. Commerce qualified its concession, however, by stating that foreign exchange losses might apply in other circumstances, and that its determination is thus still legally valid. Commerce agrees with Negev that the EIS program is correctly described in the companion countervailing duty determination:

The [EIS] program, operated by the Israel Foreign Trade Risk Insurance Corp. Ltd. (IFTRIC), is aimed at insuring

exporters against losses which result when the rate of inflation exceeds the rate of devaluation and the [New Israeli Shekel] value of an exporter's foreign currency receivable does not rise enough to cover increases in local costs.

The EIS scheme is optional and open to any exporter willing to pay a premium to IFTRIC. Compensation is based on a comparison of the change in the rate of devaluation of the [New Israeli Shekel] against a basket of foreign currencies with the change in the consumer price index. If the rate of inflation is greater than the rate of devaluation, the exporter is compensated by an amount equal to the difference between these two rates multiplied by the value-added of the exports. If the rate of devaluation is higher than the change in the domestic price index, however, the exporter must compensate IFTRIC.

52 Fed.Reg. at 25,449–50.

Commerce also conceded at oral argument that (1) Negev received EIS payments, (2) that the payments were on two sales made to the United States, (3) that the payments were tied to the two sales, (4) that Negev recorded the EIS payments as revenue, and (5) that Negev received no comparable payments for its home-market sales in Israel. Even with these concessions, Commerce states that it correctly determined that the EIS payments do not qualify for a circumstance of sale adjustment because they are not the type of expense or credit for which Commerce allows adjustments, nor do the EIS payments satisfy the requirements of 19 C.F.R. § 353.15.

The antidumping law provides in part that:

In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to—

...

(B) other differences in circumstances of sale; ... then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4) (1982). In order to facilitate adjustments for differences in the circumstances of sale, Commerce promulgated 19 C.F.R. § 353.15, which sets out specific classes of adjustments and provides criteria for determining the amount of allowances under 19 U.S.C. § 1677b(a)(4)(B) (1982). *Smith–Corona Group, Consumer Prods. Div., SCM Corp. v. United States,* 1 Fed.Cir. (T) 130, 135, 713 F.2d 1568, 1574 (1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Commerce set forth the general rule for circumstance of sale adjustments in 19 C.F.R. § 353.15(a):

In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary [of Commerce or his designee] that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

19 C.F.R. § 353.15(a) (1988). Commerce's regulations also provide examples of adjustments that will be allowed, generally involving the seller's providing a service in one market that either is not provided in the other market or is provided on different terms:

Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances also generally will be made for differences in commissions. Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a

later sale of the merchandise by a purchaser.

19 C.F.R. § 353.15(b) (1988).

Commerce found that the payments Negev received from the Israeli government on certain export sales as compensation for the effects of inflation and exchange rate fluctuations is not within the realm of service items covered by the regulation on circumstance of sale adjustments. The EIS program is not a credit, warranty, or guarantee extended to a purchaser; it is not technical assistance given to a buyer; nor is it the assumption by the seller of the purchaser's advertising or selling costs. Commerce found the EIS program to be strictly a benefit conferred upon the seller, which Commerce determined to be a countervailable subsidy in the companion investigation. 52 Fed.Reg. at 25,449–50.

Further, the EIS receipts do not account for any difference in the prices of the sales that Commerce compared. The price that Negev charged its United States and home market purchasers for its product was not affected by the EIS payments. Negev simply received a rebate payment of purchase price from its government after the date of payment of the purchase price by the United States purchaser. The EIS payments are based upon a comparison of the change in the rate of devaluation of the New Israeli Shekel against a basket of foreign currencies with the change in the consumer price index. The method of calculating the EIS payment is not related to the price of the product that Negev established at the time of sale. Far from being assured of a payment under the EIS program, Negev might actually have had to pay money to IFTRIC if the rate of devaluation was higher than the change in the domestic price index. 52 Fed.Reg. at 25,449–50. *Cf. Certain Welded Carbon Steel Standard Pipe and Tube from India; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 9089 (Mar. 17, 1986), and *Sawhill Tubular Div., Cyclops Corp. v. United States,* 11 CIT —, 666 F.Supp. 1550 (1987) (circumstance of sale adjustment allowed and affirmed for government payments made under an international price reimbursement scheme to exporters who faced no possibility that they themselves might have to pay money).

■ Congress has given Commerce broad discretion to determine whether a factor or condition of sales warrants an adjustment in foreign market value for circumstances of sale. *Carlisle Tire & Rubber Co. v. United States,* 9 CIT 520, 528–29, 622 F.Supp. 1071, 1078 (1985); *Brother Indus. v. United States,* 3 CIT 125, 540 F.Supp. 1341 (1982). At best, Negev offers a different methodology with which to analyze EIS payments. The Court, however, may not substitute its judgment for that of Commerce when there is a choice between two fairly conflicting views, even though the Court might have made a different choice had the matter been before it *de novo. Mitsubishi Elec. Corp. v. United States,* 12 CIT __, __, 700 F.Supp. 538, 558 (1988); *Hercules Inc. v. United States,* 11 CIT __, 673 F.Supp. 454, 469 (1987).

■ The Court finds that Commerce reasonably exercised its discretion under 19 U.S.C. § 1677b(a)(4)(B) (1982) and 19 C.F.R. § 353.15 in determining that the EIS payments did not qualify for a circumstance of sale adjustment. The Court also finds that Commerce did account for the EIS payments by reducing Negev's antidumping duty deposit rate from 6.62 percent to 1.77 percent to represent the countervailable benefit of the EIS payments to Negev. This reduction conforms to Article VI(4) of the GATT, which prohibits products from being "subject to both antidumping and countervailing duties to compensate for the same situation of dumping or export subsidization." General Agreement on Tariffs and Trade, art. VI, ¶ 4, *opened for signature* Oct. 30, 1947, 61 Stat. A11, A24, T.I. A.S. No. 1700. The Court finds that Commerce's determination is according to law and based on substantial evidence in the record as a whole.

## II. *The Commission's Affirmative Injury Determination*

■ Pursuant to 19 U.S.C. § 1671d(b), the Commission determined that a United

States industry is materially injured by reason of imports from Israel of industrial phosphoric acid that Commerce found to be subsidized by the government of Israel. USITC Pub. 2000 at 1. The Commission also determined, pursuant to 19 U.S.C. § 1673d(b), that a United States industry is materially injured by reason of imports from Belgium and Israel of industrial phosphoric acid that Commerce found to be sold in the United States at less than fair value. USITC Pub. 2000 at 1.

The Commission majority based its affirmative material injury determination primarily on the overall decline in the domestic industry's performance, increased volume and market share of cumulated imports from Israel and Belgium, and evidence of underselling of the domestic product by the imports causing price suppression and price depression. *Id.* at 3. The Commission's Chairman and Vice–Chairman dissented. *Id.* at 23, 39.

Negev does not challenge the Commission's determination that the domestic industry producing industrial phosphoric acid is suffering material injury. Nor does Negev contend that the data obtained in the investigation was immaterial or improperly derived. Rather Negev claims that evidence on the record as a whole shows that (a) the volume of imports was insignificant; (b) there was no significant price undercutting, price depression, or price suppression; and (c) the Commission majority should not have relied on allegations of lost sales and revenues as proof of the impact of imports on the domestic industry's profitability.

### A. Volume

Negev challenges the Commission's discussion of the volume of imports on two grounds. First, Negev claims that the Commission "avoided" making a finding as to whether the volume of imports is significant. Second, Negev claims that, by "fail[ing] to keep in perspective the very small quantities of imports involved," the Commission ignored evidence of record indicating that the volume of imports could not be a significant factor contributing to the harm suffered by the domestic industry. Negev notes the value and volume of import penetration at its peak, and cites the dissenting views of the Chairman and Vice–Chairman that the volume of imports was not significant. Negev provides no other support for its contention that import penetration levels or trends are insignificant.

In its determination, the Commission majority noted Negev's contention that the volume of imports was too low to constitute a cause of material injury to the domestic industry. The majority cited legislative history to the Trade Agreements Act of 1979 that a given level of imports may or may not be significant, depending on other factors. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 88 (1979), U.S.Code Cong. & Admin.News 1979, p. 381. The Commission stated that

a certain volume of imports in a market dominated by a relatively healthy domestic industry may be incapable of causing material injury. However, in a market where both consumption and the performance of the domestic industry are in decline, and where there is severe price competition, that same volume of imports, even if it should lead to a relatively small number of lost sales, may cause substantial price suppression or depression, thereby reducing profitability throughout the domestic industry. Thus, whether a significant cause of material injury depends upon the conditions of trade in the industry, the nature of the industry itself, and the economic conditions of the industry at the time of the imports become a factor in the market.

USITC Pub. 2000, at 18. *Accord USX Corp. v. United States*, 11 CIT ——, 655 F.Supp. 487, 490 (1987) (citing H.R.Rep. 317, 96th Cong., 1st Sess. 46 (1979)). Having noted that even small volumes of imports—should they suppress or depress domestic prices—may be a cause of material injury, the Commission then stated that it was "particularly significant that the sharpest increase in the absolute and in the relative volume of imports, as well as in the ratio of the value of imports to the value of total and open market domestic consumption, occurred in 1984–1985, when the per-

formance of the domestic industry suffered a very marked decline." USITC Pub. 2000 at 19.

The record evidence on which the Commission relied for its conclusion shows that the volume and market share of the imports grew steadily during the period of investigation. *Id.* at 18–19, A94–95; Conf. R.Doc. 24 at 57–61. The cumulative volume of imports from Belgium and Israel increased from 21.7 million pounds in 1984 to 47.6 million pounds in 1985, and increased again to 53.6 million pounds in 1986. USITC Pub. 2000 at 18. As a percentage of total apparent domestic consumption, imports from Belgium and Israel increased from 0.9 percent in 1984, to 2.2 percent in 1985, to 2.5 percent in 1986. USITC Pub. 2000 at 18–19. As a share of total consumption in the open market, where importers compete for sales with domestic producers, the level of imports increased in volume from 2.7 percent in 1984, to 5.9 percent in 1985, to 7.0 percent in 1986. *Id.* at 19, A94.

The Commission majority determined that the decline in domestic prices, in conjunction with import penetration trends and pricing practices, established a causal link between the imports and the material injury of the domestic industry. The Commission majority found it "particularly significant that the sharpest increase in the absolute and in the relative volume of the imports, as well as in the ratio of the value of imports to the value of total and open market domestic consumption, occurred in 1984–1985, when the performance of the domestic industry suffered a very marked decline." *Id.* at 19.

 The fact that the Commission did not explicitly declare that the volume of imports was significant is not fatal, for the Court may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Ceramica Regiomontana v. United States,* 810 F.2d 1137, 1139 (Fed.Cir.1987); *American Spring Wire Corp. v. United States,* 8 CIT 20, 23, 590 F.Supp. 1273, 1277 (1984), *aff'd sub nom. Armco, Inc. v. United States,* 3 Fed. Cir. (T) 123, 760 F.2d 249 (1985). The Com-

mission is required to determine whether the domestic industry is materially injured by reason of the imports under investigation, *see* 19 U.S.C. § 1673d(b)(1), and to provide a rationale for its determination. *Bowman Transp. Inc. v. Arkansas Best Freight Sys.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). The Commission, however, is not required to make explicit findings with respect to all the factors that it considers. *Gifford–Hill Cement Co.,* 9 CIT at 369–70, 615 F.Supp. at 587.

Within the constraints of maintaining the confidentiality of business proprietary information, the Commission considered and addressed in the majority's findings the steady growth in the absolute and relative volume of imports, and the significance of these trends having coincided with a decline in the condition of the domestic industry as domestic prices fell. The Commission majority recognized that "import volume alone cannot be used to gauge accurately the effect of imports," *USX Corp.,* 11 CIT at ——, 655 F.Supp. at 490, in an industry manufacturing a product that is price sensitive and fungible, because even small volumes of imports may, by virtue of underselling, cause price suppression and depression. The Commission majority found that although industrial phosphoric acid may be produced in varying assays or concentrations, it is essentially a fungible product. USITC Pub. 2000 at 14, and determined that there has been significant underselling by the imports. In reaching its determination that the cumulated imports had an adverse impact on domestic prices, the Commission considered evidence of lost sales, underselling, and domestic producers' reductions in price in order to meet competition from imports. *Id.* Having thus articulated a rational connection between the underlying facts found and its ultimate determination, the Court finds that the Commission, in accordance with 19 U.S.C. § 1677(7)(C)(i), did consider "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant," and that the majority's deter-

mination is supported by substantial evidence on the record as a whole.

### B. Price Levels

The Commission majority found that over the period of investigation, the prices of imports from Belgium and Israel have generally been below those of the domestic industry:

> The Commission gathered quarterly price data for the sale of industrial phosphoric acid from the first quarter of 1984 through the first quarter of 1987. Domestic prices were generally stable during 1984 and 1985, yet they declined sharply over the period from the first quarter of 1986 through the first quarter of 1987. U.S. producer's technical grade prices were approximately four to nine percent lower in January–March 1987 than they were in 1984.

USITC Pub. 2000 at 20. The Commission found that with respect to the price trends for imports, to a certain extent, the data were mixed:

> In some quarters, imported acid from Belgium or from Israel was sold to end users or to distributors at prices higher than the prices charged by the domestic industry. Yet in the market for 75–percent assay technical grade acid, wherein the bulk of sales of both imported acid and domestic acid occurred, the data show a significant degree of underselling by importers; and in the market for 80–percent assay technical grade acid, there is even a greater degree of underselling. Further, to the extent there is evidence of overselling of the imported product, both the volumes of imported acid sold at such higher prices, and the number of transactions involved, were relatively small.

USITC Pub. 2000 at 21. The Commission majority thus concluded that the "presence of the lower priced [less than fair value] and subsidized imports in the market has had a suppressive and depressive effect on prices." USITC Pub. 2000 at 22.

Negev contends that it is not true that prices of imports from Belgium and Israel have "generally" been lower than those of the domestic industry, nor is there a "sig-nificant degree of underselling by importers" in the 75–percent and 80–percent assay technical grade acid markets, the Commission majority did not discuss the evidence of pricing reported by the purchasers, the Commission should have examined the range of import and domestic prices as it has in other investigations, and having cumulated the volume of imports from Belgium and Israel, the Commission was also required under the cumulation statute to cumulate the prices of those imports.

#### 1. Evidence in Support of the Commission's Findings

In assessing the price effects of imports under investigation, the Commission must consider whether—

> (I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii) (1982). "[A]ny time the Commission relies on underselling to support its determination, it must support its finding of underselling with evidence in the record." *Alberta Pork Producers' Mktg. Bd. v. United States,* 11 CIT ——, 669 F.Supp. 445, 465 (1987), *aff'd following remand,* 12 CIT ——, 683 F.Supp. 1398 (1988).

The Commission majority acknowledged that the price trends for imports, in terms of their relation to domestic prices, were "mixed." USITC Pub. 2000 at 21. While the Commission did not cite the specific incidents of underselling, the Commission found "a significant degree of underselling by importers" in the 75–percent assay technical grade segment of the market, where the bulk of import sales occurred, as well as in the 80–percent assay technical grade market. The Commission had sent questionnaires to the major importers and domestic producers of industrial phosphoric acid requesting data as to the prices they charged to both distributors and end users.

Price questionnaires with usable data were received from five domestic producers, accounting for 100 percent of domestic shipments in 1986, and four importers of phosphoric acid, accounting for almost all imports from Belgium and Israel. *Id.* at 20 n. 83.

Questionnaire respondents provided, for each calendar quarter over the period of investigation (January 1984 to March 1987), the net f.o.b. price charged for the single largest shipment to their "three best customers" on sales of 75–percent and 80–percent assay technical grade acid to both distributors and end users. *See, e.g.,* Conf. R.Doc. 25.28, at 15. In the questionnaires, "best customers" were defined as those customers who purchase large quantities of industrial phosphoric acid on a regular basis. The pricing data obtained related to sales involving substantial volumes of imports and, by reflecting large shipments to "best customers," were intended to avoid analysis of incidental spot sales. To ascertain whether the decline in domestic prices may have been caused by the incidence of import underselling, the Commission staff calculated and compared the "weighted-average" or "unit" prices charged by United States producers and by importers of Belgian and Israeli acid in the four primary market segments where the domestic industry and importers compete for sales. *See* Conf.R.Doc. 24 at 78–82.

The Court has examined the confidential business proprietary information on the prices of 75–percent assay technical grade and 80–percent technical grade sold to distributors and end users, as well as 75 percent assay food grade and agricultural grade industrial phosphoric acid. *See, e.g.,* Conf.R.Doc. 24, at 78–82. The record supports the Commission's comparison of United States versus Belgian and Israeli prices in the distributor and end user markets for technical grade acid as showing that the Israeli or Belgian product did undercut United States producers' prices in most of the comparisons. USITC Pub. 2000 at 21; Conf.R.Doc. 24 at 78–82. The Commission also noted that most of the cases where overselling was found involved end users, who may have less leverage in negotiating

a lower purchase price where the volume of acid being purchased was small. *Id.* at n. 91. These statements indicate that the Commission did consider evidence of overselling, and the Commission's majority opinion does acknowledge that the data as to overselling and underselling are "mixed." *Id.* at 21.

The Court finds that the Commission did consider evidence of overselling, and that the Commission's conclusions on underselling are supported by substantial evidence on the record as a whole.

### 2. *Price Cumulation*

 Negev argues that because the Commission cumulated the volume of Israeli imports with the Belgian imports, the cumulation statute further required the Commission to cumulate the prices of the Israeli and Belgian imports. Although the Commission's power to cumulate import statistics is now well-established, *see Fundicao Tupy S.A. v. United States,* 12 CIT ——, 678 F.Supp. 898, *aff'd,* 859 F.2d 915 (Fed.Cir.1988); Mock, *Cumulation of Import Statistics in Injury Investigations before the International Trade Commission,* Nw.J.Int'l L. & Bus. 433 (1986), the question of whether "price" comprises one of those import statistics which the Commission must cumulate is a question of first impression in this Court.

The Trade and Tariff Act of 1984 established a statutory standard for the Commission to cumulate import statistics in an investigation:

> For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

19 U.S.C. § 1677(7)(C)(iv) (Supp. IV 1986). Clauses (i) and (ii) provide:

(i) Volume

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of

the merchandise, or any increase in that volume, either in absolute terms or relative to the production or consumption in the United States, is significant.

(ii) Price

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(i) and (ii) (1982).

Negev argues that Congress intended for the Commission to cumulate the prices of imports as well as volume.

The Commission states that it was its practice prior to Congress' enactment of the cumulation provision in the 1984 Act, and it has since been the Commission's consistent practice, *not* to undertake a unitary import price analysis. *See, e.g., Color Picture Tubes From Canada, Japan, The Republic of Korea, and Singapore,* Inv. Nos. 731–TA–367 through 370 (Final), USITC Pub. 2046 (Dec. 1987); *Certain Forged Steel Crankshafts From the Federal Republic of Germany and the United Kingdom,* Inv. Nos. 731–TA–351 and 353 (Final), USITC Pub. 2014 (Sept. 1987); *Certain Malleable Cast–Iron Pipe Fittings From Thailand,* Inv. No. 731–TA–348 (Final), USITC Pub. 2004 (Aug. 1987); *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers From Italy and Yugoslavia,* Inv. Nos. 731–TA–342 and 346 (Final), USITC Pub. 1987 (June 1987); *Certain Fresh Cut Flowers From Canada, Chile, Columbia, Costa Rica, Ecuador, Israel, and the Netherlands,* Inv. Nos. 731–TA– 327 through 331 (Final), USITC Pub. 1956 (Mar. 1987); *Top–Of–The–Stove Stainless Steel Cooking Ware From Korea and Taiwan,* Inv. Nos. 701–TA–267 and 268, 731– TA–304 and 305 (Final), USITC Pub. 1936 (Jan. 1987); *Certain Brass Sheet and Strip From Brazil, Canada, and the Republic of Korea,* Inv. Nos. 731–TA–311, 312, and 315 (Final), USITC Pub. 1930 (Dec. 1986); *Butt–Weld Pipe Fittings From Brazil and Taiwan,* Inv. Nos. 731–TA–308 and 310 (Final), USITC Pub. 1918 (Dec. 1986); *Oil Country Tubular Goods from Canada and Taiwan,* Inv. Nos. 701–TA– 255, 731–TA–276 and 277 (Final), USITC Pub. 1865 (June 1986); *Iron Construction Castings from Canada,* Inv. No. 731–TA– 263 (Final), USITC Pub. 1811 (Feb. 1986); *Low Fuming Brazing Copper Wire and Rod from New Zealand,* Inv. No. 731–TA– 246 (Final), USITC Pub. 1779 (Nov. 1985).

While Negev recognizes the Commission's substantial record of consistent refusal to cumulate prices, Negev argues "that does not mean that Congress did not intend for it to do so." *Plaintiff's Reply Brief* at 63. Negev claims that "Congress *obviously* meant for cumulated imports to be considered as a unit for purposes of volume *and* price analysis." *Id.* (emphasis added).

The Commission denies that Congress intended the Commission to analyze the price effects of imports through the unitary weighted average import price analysis which Negev proposes.

In enacting the Trade Agreements Act of 1979, Congress required the Commission to consider various factors bearing on the question of whether material injury to the domestic industry is "by reason of" the imports under investigation. Congress did not direct the Commission to analyze in any particular manner the volume of imports, their price effects, and their impact on the domestic industry. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 75 (1979). In enacting the Trade and Tariff Act of 1984, however, Congress directed the Commission, in considering the volume and effect of imports under investigation, to "cumulatively assess the volume and effects of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market." 19 U.S.C. § 1677(7)(C)(iv) (Supp. IV 1986). *See also* Omnibus Trade

and Competitiveness Act of 1988, § 1330, Pub.L. No. 100–418, 102 Stat. 1107, 1206–07 (1988) (Commission may treat as negligible and having no discernable adverse impact on the domestic industry imports from any country that is a party to a free trade agreement with the United States which entered into force and effect before January 1, 1987, *i.e.,* Israel, if the Commission determines that the domestic industry is not being injured by reason of those imports).

The Commission's interpretation of the 1984 cumulation statute is that it "does not mandate a 'unitary' import price analysis; it plainly states that the Commission shall cumulatively assess the 'effects,' including the price effects, of imports, and does not provide that the Commission cumulatively assess import prices." *United States International Trade Commission's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record* at 40.

In the absence of a statutory requirement or prohibition, the Commission has discretion in its choice of reasonable analytical methodologies. *See Mitsubishi Elec. Corp. v. United States,* 12 CIT —, —, 700 F.Supp. 538, 558 (1988); *Kenda Rubber Indus. Co. v. United States,* 10 CIT 120, 126–27, 630 F.Supp. 354, 359 (1986); *American Spring Wire Corp. v. United States,* 8 CIT 20, 23, 590 F.Supp. 1273, 1277 (1984), *aff'd sub nom., Armco, Inc. v. United States,* 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985). The Commission argues that Negev's interpretation of the cumulation statute as requiring a unitary pricing analysis contravenes Congress' intent. The Commission points to legislative history of the cumulation statute:

> The purpose of mandating cumulation under appropriate circumstances is to eliminate inconsistencies in Commission practice and to ensure that the injury test adequately addresses simultaneous unfair imports from different countries.... The Committee believes that the practice of cumulation is based on the sound principle of preventing material injury which comes about by virtue of several simultaneous unfair acts or practices.

H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5127, 5164. The Commission thus considers the cumulation requirement to ensure that all adverse price effects resulting from unfairly traded imports from different countries that occur over the period of investigation are considered by the Commission in its causation analysis. *See also* Bello & Holmer, *The Trade and Tariff Act of 1984: Principal Antidumping and Countervailing Duty Provisions,* 19 Int'l L. 639, 660 (1983).

Negev argues that the effect of the statutorily prescribed cumulation is to eliminate country differentials and to proceed with an analysis using one set of unitary numbers representing all imports under investigation. *Plaintiff's Reply Brief* at 61.

The Commission states that Negev's proposed analysis would aggregate import prices in a manner that masks underselling in a price sensitive market and contravene the requirement that the Commission fairly consider the adverse price effects of all imports under investigation:

> Under plaintiff's unitary import price analysis, where imports from one country undercut the prices charged by U.S. producers, the extent of that underselling is masked by a higher "combined import price" caused by another country's overselling during the same time period. Since plaintiff has not shown that the effects of underselling of imports from Belgium in one series of transactions are somehow nullified by simultaneous overselling of imports from Israel in another series of transactions, a unitary price analysis in this case is contrary to the express purpose of cumulation.

*United States International Trade Commission's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record* at 43. By masking the incidence of price undercutting by importers, the Commission finds Negev's unitary combined import price analysis is mislead-

ing for analysis of the Belgian and Israeli imports.

■ While Negev offers another interpretation of the cumulation statute, this does not render the Commission's interpretation of the statute unlawful or make the determination contrary to law. *Matsushita Elec. Indus. Co. v. United States*, 3 Fed.Cir. (T) 44, 54, 750 F.2d 927, 936 (1984). A court may not substitute its own construction of a statutory provision for a reasonable interpretation made by an agency charged with administering the statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The Court holds that the Commission is not required under the cumulation statute to cumulate the prices of imports. This holding should not be read to prohibit the Commission from undertaking such an analysis in a future investigation if it is warranted under the record before the Commission and if the Commission finds it to be a helpful analytical tool in making its material injury and threat of material injury determinations.

### 3. *Price Range Analysis*

■ Negev also argues that the Commission should have examined the relative pricing of imports by comparing the range of import prices to the range of domestic prices, i.e., comparing the importers' lowest and highest prices on transactions against the domestic producers' lowest and highest prices. Negev claims that a price range analysis is necessary because the low and high domestic prices differ widely, and is proper because the Commission has used this methodology in other investigations. *See, e.g., Certain Steel Valves and Certain Parts Thereof from Japan*, Inv. No. 731–TA–145 (Final), USITC Pub. 1556 (July 1984); *Portland Hydraulic Cement from Australia and Japan*, Invs. Nos. 731–TA–108 and 109 (Final), USITC Pub. 1440 (Oct. 1983).

Although Negev claims a price range analysis is necessary, there is no statutory requirement to do so and the Commission has elected to not undertake a price range analysis in other investigations involving price undercutting by fungible imports. *See, e.g., Certain Acetylsalicylic Acid (Aspirin) from Turkey*, Inv. Nos. 701–TA–283 and 731–TA–364 (Final) USITC Pub. 2001 (Aug.1987); *Urea from the German Democratic Republic, Romania, and the Union of Soviet Socialist Republics*, Inv. Nos. 731–TA–338–340 (Final), USITC Pub. 1992 (July 1987); *In Shell Pistachio Nuts from Iran*, Inv. No. 731–TA–287 (Final), USITC Pub. 1875 (July 1986); *Nitrocellulose from France*, Inv. No. 731–TA–96 (Final), USITC Pub. 1409 (July 1983); *Sodium Nitrate from Chile*, Inv. No. 831–TA–91 (Final), USITC Pub. 1357 (Mar.1983).

In the absence of a statutory requirement, the Commission's discretionary election not to conduct such an analysis does not render its determination contrary to law. Nonetheless, the Court has examined the confidential record and finds that Negev's price range analysis, which in several instances compares individual sale prices for small quantities of imports, does not substantially detract from the evidence upon which the Commission relied to find significant price undercutting. *See Certain Steel Valves and Certain Parts Thereof from Japan*, Inv. No. 731–TA–145 (Final), USITC Pub. 1556, at 13–14 (July 1984) ("considerable overlap between prices . . . is typical of competitive markets").

The Court finds that Negev's alternative methodology does not refute the substantial evidence supporting the Commission majority's determination, and that the Commission's determination not to use this analysis in this investigation is neither arbitrary nor capricious. Negev offers "another rational characterization of the evidence," *Gifford–Hill Cement Co. v. U.S.*, 9 CIT 357, 372, 615 F.Supp. 577, 589 (1985), but this does not warrant reversal or remand of the determination under the substantial evidence standard of review. *See Matsushita Elec. Indus. Co. v. United States*, 3 Fed.Cir. (T) 44, 54, 750 F.2d 927, 936 (1984).

### C. Lost Sales and Underselling

The Commission majority stated that in considering the impact of the cumulated imports on prices, it considered

the volumes of the imported acid sold at specified average prices, the testimony of witnesses and other record evidence as to lost sales due to underselling by respondents, and the domestic industry's price reductions to meet the competition from the subject imports.

USITC Pub. 2000 at 22.

### a. *Testimony*

Negev challenges the Commission's consideration of "testimony of witnesses and other record evidence as to lost sales and underselling by respondents and the domestic industries price reductions to meet the competition from subject imports." *Plaintiff's Brief* at 54–55.

The Commission states that the hearing testimony supported the domestic industry's claims that: 1) the domestic industry is in vigorous price competition with imports and has had to reduce prices to keep from losing more market share, 2) that notwithstanding reductions in unit costs of production, the domestic industry's profit margins have eroded due to "pricing problems," and 3) that price is a principal reason why some domestic buyers purchase Belgian or Israeli imports.

■■■ While Negev dismisses the testimony as "self serving statements by witnesses for FMC and Monsanto," *Plaintiff's Brief* at 57, assessments of the credibility of witnesses are within the province of the trier of fact. *See Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *Matsushita Elec. Indus. Co. v. United States*, 3 Fed.Cir. (T) 44, 54, 750 F.2d 927, 935 (Fed. Cir.1984). This Court lacks authority to interfere with the Commission's discretion as trier of fact to interpret reasonably evidence collected in the investigation. *Copperweld Corp. v. United States*, 12 CIT —, 682 F.Supp. 552 (1988). *See also* DeGrandis, *Proving Causation in Antidumping Cases*, 20 Int'l L. 563, 579–80 (1986) (judicial review of the Commission's causation findings).

### b. *Lost Sales Data*

The confidential version of the staff report identifies the number of companies with which the Commission's staff communicated regarding lost sales and revenues. Conf.R.Doc. 24 at 87–91. Negev argues the Commission's determination is flawed because of the Commission's reliance on this data.

■■■ While the Commission may find anecdotal evidence to be a helpful analytical tool in some cases, it is not an absolute requirement. Where fungible goods are concerned, volume may be the best indicator of lost sales, rather than the anecdotal evidence obtained in the typical lost sales study. *USX Corp. v. United States*, 11 CIT —, 655 F.Supp. 487, 491 (1987). Negev offers an alternative interpretation of the evidence, but it has failed to show that the Commission's determination does not rest upon such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Matsushita*, 3 Fed. Cir. (T) at 51, 750 F.2d at 933.

The Court finds the Commission has acted within its delegated authority, has correctly interpreted statutory language, and has correctly applied the law. *See City Lumber Co. v. United States*, 59 CCPA 89, 92, 457 F.2d 991, 994 (1972).

### CONCLUSION

The Court finds both Commerce's final determination of sales at less than fair value and the Commission's material injury determination by reason of dumped and subsidized imports to be supported by substantial evidence on the administrative record as a whole and according to law. The action is dismissed.