KERN-LIEBERS USA, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND U.S. STEEL GROUP—A UNIT OF USX CORP., BETHLEHEM STEEL CORP., NATIONAL STEEL CORP., WCI STEEL, INC., GULF STATES STEEL, INC. OF ALABAMA, LTV STEEL CO., INC., AK STEEL CORP., INLAND STEEL INDUSTRIES, INC., AND SHARON STEEL CORP., DEFENDANT-INTERVENORS

Consolidated Court No. 93–09–00552

(Dated January 27, 1995)

*Porter, Wright, Morris & Arthur (Leslie Alan Glick* and *Richard J. Burke)* for plaintiff Kern-Liebers USA, Inc.

*Dewey Ballantine (Alan Wm. Wolff, Michael H. Stein, Linda C. Menghetti* and *Joseph A. Black)* and *Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan* and *Stephen Narkin)* for plaintiffs and defendant-intervenors U.S. Steel Group—A Unit of USX Corporation, Bethlehem Steel Corporation, AK Steel Corp., Gulf States Steel, Inc. of Alabama, Inland Steel Industries, Inc., LTV Steel Company, Inc., National Steel Corporation, Sharon Steel Corporation, Geneva Steel, Laclede Steel Company, and WCI Steel, Inc.

*Morrison & Foerster (Donald B. Cameron, Julie C. Mendoza, Alan K. Palmer, Neal J. Reynolds, G. Brian Busey, Craig A. Lewis, M. Diana Helweg* and *Sue Lynn Koo)* for plaintiffs and defendant-intervenors Dongbu Steel Co., Ltd., Pohang Iron & Steel Co., Ltd., Pohang Coated Steel Co., Ltd., Pohang Steel Industries Co., Ltd., and Union Steel Manufacturing Co., Ltd.

*Sharretts, Paley, Carter & Blauvelt, P.C.* (Gail T. Cumins), *Ned H. Marshak* and *Beatrice A. Brickell,* of counsel, for plaintiffs and defendant-intervenors Thyssen Stahl AG, Thyssen Steel Detroit Co., Thyssen Inc., Preussag Stahl AG, Klöckner Stahl GmbH, Fried. Krupp AG Hoesch-Krupp, and Krupp-Hoesch Stahl AG.

*Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Neil R. Ellis* and *Elizabeth C. Hafner)* for plaintiffs and defendant-intervenors Hoogovens Groep BV and N.V.W. (U.S.A.), Inc.

*Lyn M. Schlitt,* General Counsel, *James A. Toupin,* Deputy General Counsel, United States International Trade Commission *(Cynthia P. Johnson, Judith Czako, Scott D. Andersen* and *James M. Lyons)* for defendant.

*Willkie Farr & Gallagher (William H. Barringer, Christopher A. Dunn, Matthew R. Nicely* and *Nancy A. Fischer)* for defendant-intervenors NKK Corporation, Kawasaki Steel Corporation, Kobe Steel, Ltd., Nippon Steel Corporation, Nisshin Steel Co., Ltd., Sumitomo Metal Industries, Ltd., and Stelco, Inc.

*Barnes, Richardson & Colburn (Gunter von Conrad* and *Peter A. Martin)* for defendant-intervenor Voest Alpine Stahl, A.G.

*Cameron & Hornbostel (William K. Ince)* for defendant-intervenor Sidbec-Dosco, Inc.

*Dickstein, Shapiro & Morin (Arthur J. Lafave III* and *Douglas N. Jacobson)* for defendant-intervenor Companhia Siderurgica Nacional S.A.

*George V. Egge Jr., P.C. (George V. Egge Jr.)* for defendant-intervenor Empresa Nacional Siderúrgica, S.A.

*Mudge Rose Guthrie Alexander & Ferdon (David P. Houlihan, Richard G. King* and *Gregory J. Spak)* for defendant-intervenor Propulsora Siderurgica S.A.I.C.

*O'Melveny & Myers (Bruce R. Hirsh* and *Gary N. Horlick)* for defendant-intervenors Sidmar N.V. and TradeARBED, Inc.

*Rogers & Wells (William Silverman, Carrie A. Simon* and *Ryan Trainer)* for defendant-intervenors Dofasco, Inc., ILVA, S.p.A. and ILVA USA, Inc.

*Weil, Gotshal & Manges (A. Paul Victor)* for defendant-intervenors Usinor Sacilor and Sollac.

## OPINION

RESTANI, *Judge:* This matter is before the court on several motions for judgment upon the agency record pursuant to USCIT Rule 56.2. These

motions have been brought by (1) Kern-Liebers USA, Inc. ("Kern-Liebers"), (2) Bethlehem Steel Corporation, AK Steel Corp., Gulf States Steel, Inc. of Alabama, Inland Steel Industries, Inc., LTV Steel Company, Inc., National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group—A Unit of USX Corporation, Geneva Steel, Laclede Steel Company, and WCI Steel, Inc. (collectively "petitioners"), (3) NKK Corporation, Kobe Steel, Ltd., Nippon Steel Corporation, Nisshin Steel Co., Ltd., Sumitomo Metal Industries, Ltd., Kawasaki Steel Corporation, Stelco, Inc., Pohang Iron & Steel Co., Ltd., Preussag Stahl AG, Klöckner Stahl GmbH, Krupp-Hoesch Stahl AG, Fried. Krupp AG Hoesch-Krupp, Thyssen Stahl AG, Sidmar N.V., TradeARBED, Inc., Hoogovens Groep BV, N.V.W. (U.S.A.), Inc., Sidbec-Dosco, Inc., Dofasco, Inc., ILVA S.p.A., ILVA USA, Inc., Usinor Sacilor, Sollac, Propulsora Siderurgica S.A.I.C., Voest Alpine Stahl, A.G., Companhia Siderurgica Nacional S.A. and Empresa Nacional Siderúrgica, S.A. (collectively "respondents"), (4) Dongbu Steel Co., Ltd., Pohang Iron & Steel Co., Ltd., Pohang Coated Steel Co., Ltd., Pohang Steel Industries Co., Ltd., and Union Steel Manufacturing Co., Ltd. (collectively "Dongbu"), (5) Hoogovens Groep BV and N.V.W. (U.S.A.), Inc. (collectively "Hoogovens"), and (6) Thyssen Stahl AG, Thyssen Steel Detroit Co., Thyssen Inc., Preussag Stahl AG, Klöckner Stahl GmbH, Fried. Krupp AG Hoesch-Krupp and Krupp-Hoesch Stahl AG (collectively "Thyssen"). To facilitate adjudication of the issues, the court has consolidated various separate challenges to the determination of the United States International Trade Commission (the "Commission") in *Certain Flat-Rolled Carbon Steel Prods. from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, The Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom,* 58 Fed. Reg. 43,905 (USITC 1993) (final determs.).[1]

## BACKGROUND

On June 30, 1992, petitioners filed with the International Trade Administration of the United States Department of Commerce ("Commerce") and the Commission petitions alleging that an industry in the United States was materially injured or threatened with material injury by reason of subsidized and/or less than fair value ("LTFV") imports of certain flat-rolled carbon steel products. The petitions covered four classes of flat-rolled carbon steel imports from 21 countries—cut-to-length plate, hot-rolled, cold-rolled and corrosion-resistant steel products. At issue in the present case are the cold-rolled flat-rolled carbon steel ("cold-rolled steel") products.

Commerce defined the scope of the investigation of cold-rolled steel products as

---

[1] The Commissioners rendering this determination were Chairman Newquist, Vice Chairman Watson, and Commissioners Rohr, Brunsdale, Crawford and Nuzum. As the Chairmanship and Vice Chairmanship positions have since changed, each member of the Commission shall be referred to as "Commissioner."

cold-rolled (cold-reduced) carbon steel flat products, of solid rectangular (other than square) cross section, of rectangular shape, neither clad, plated nor coated with metal, whether or not painted, varnished or coated with plastics or other nonmetallic substances, in coils, or in straight lengths which, if of a thickness less than 4.75 millimeters, are of a width measuring at least 10 times the thickness or if of a thickness of 4.75 millimeters or more are of a width which exceeds 150 millimeters and measures at least twice the thickness.

*Certain Cold-Rolled Carbon Steel Flat Prods. from Various Countries,* 57 Fed. Reg. 33,488, 33,491 (Dep't Comm. 1992) (init. of antidumping duty investigations); *see Certain Flat-Rolled Carbon Steel Prods. from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, The Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom,* USITC Pub. 2664, Inv. Nos. 701–TA–319–332, 334, 336–342, 344, and 347–353, and Inv. Nos. 731–TA–573–579, 581–592, 594–597, 599–609, and 612–619, vol. I, at 85 (Aug. 1993) (final determs. and views) *("Final Det.").*

On August 21, 1992, the Commission, in its preliminary determination, found that there was reasonable indication that an industry in the United States was materially injured or threatened with material injury by reason of allegedly subsidized and/or LTFV imports of cold-rolled steel products from Argentina, Austria, Belgium, Brazil, Canada, France, Germany, Italy, Japan, Korea, The Netherlands and Spain. *Certain Flat-Rolled Carbon Steel Prods.,* 57 Fed. Reg. 38,064, 38,064–65 (USITC 1992) (prelim. determs.). Following preliminary determinations by Commerce finding subsidized and LTFV imports of such merchandise from the subject countries,[2] the Commission commenced investigations to determine the extent of injury to the domestic flat-rolled steel industry. On August 18, 1993, the Commission published the results of its investigations.

All Commissioners agreed that the domestic cold-rolled steel industry was not materially injured by reason of the subject imports.[3] The Commission determined, however, that the domestic industry was threatened with material injury by reason of subsidized or LTFV cold-rolled

[2] *See Certain Steel Prods.,* 57 Fed. Reg. 57,739–85, 57,799–806 (Dep't Comm. 1992) (prelim. affirmative countervailing duty determs. for Austria, Belgium, Brazil, France, Germany, Italy, Korea and Spain); *Certain Cold-Rolled Carbon Steel Flat Prods.,* 58 Fed. Reg. 7066, 7073–85, 7091–106, 7113, 7120 (Dep't Comm. 1993) (prelim. determs. of LTFV sales from Argentina, Austria, Belgium, Brazil, Canada, France, Germany, Italy, Japan, Korea, The Netherlands and Spain). On July 9, 1993, Commerce published its final determinations finding subsidized/LTFV imports of cold-rolled steel from the subject countries. *Certain Steel Prods.,* 58 Fed. Reg. 37,217–338, 37,374 (Dep't Comm. 1993) (final affirmative countervailing duty determs. for Austria, Belgium, Brazil, France, Germany, Italy, Korea and Spain); *Certain Cold-Rolled Carbon Steel Flat Prods.,* 58 Fed. Reg. 37,062, 37,082–99, 37,125–76, 37,199, 37,211 (Dep't Comm. 1993) (final determs. of LTFV sales from Argentina, Austria, Belgium, Brazil, Canada, France, Germany, Italy, Japan, Korea, The Netherlands and Spain).

[3] Commissioner Newquist found that the domestic industry was not suffering material injury, *see Final Det.* at 102 n.125, 293, thus he did not apply a causation analysis to determine whether the industry was materially injured by reason of the subject imports

imports from Germany, Korea and The Netherlands.[4] 58 Fed. Reg. at 43,905–06. Further, the majority determined that the domestic industry was not materially injured or threatened with material injury by reason of subsidized or LTFV cold-rolled imports from Argentina, Austria, Belgium, Brazil, Canada, France, Italy, Japan and Spain.[5] *Id.* at 43,906–07.

Kern-Liebers challenges the Commission's like product determination as to its product, cold-rolled seat belt retractor steel. Petitioners challenge the majority's negative threat determinations with respect to Belgium, Brazil, Canada, France, Italy and Japan. Defendant and respondents oppose petitioners' challenge and ask the court to uphold the Commission's negative material injury and threat determinations. Separate challenges have been brought by Dongbu, Hoogovens and Thyssen contesting the Commission's determination that subsidized and/or LTFV cold-rolled steel imports from their respective countries, Korea, The Netherlands and Germany, threaten the domestic cold-rolled steel industry with material injury. Defendant and petitioners oppose these three challenges.

## STANDARD OF REVIEW

In reviewing final determinations in countervailing and antidumping duty investigations, the court will hold unlawful those determinations of the Commission found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988).

## DISCUSSION

I. *Like Product:*

Pursuant to 19 U.S.C. § 1677(10) (1988), the Commission is required to specify "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."[6] The bases upon which a like product determination is made "fall[  ] within the Commission's broad discretion and expertise in conducting investigations" and may depend upon the unique facts of each case. *Chung Ling Co. v. United States,* 16 CIT 636, 647, 805 F. Supp. 45, 54 (1992); *Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 634, 638, 693 F. Supp. 1165, 1169 (1988).

The Commission, in the final determination, considered four major like product groupings established by Commerce's scope determina-

---

[4] Commissioners Brunsdale and Crawford dissented as to Germany, Korea and The Netherlands. Commissioner Watson dissented as to Korea and The Netherlands.

[5] Commissioner Newquist and Commissioner Nuzum dissented as to Belgium, Brazil and France. Commissioner Newquist further dissented as to Canada and Japan. Commissioner Nuzum further dissented as to Italy and Spain. Commissioner Rohr dissented as to Canada. Commissioner Watson did not participate in the voting for Italy.

[6] Factors that the Commission typically considers in defining "like product" include (1) physical characteristics and uses, (2) interchangeability of the products, (3) channels of distribution, (4) customer and producer perceptions of the products, (5) the use of common manufacturing facilities and personnel, and (6) price. *See Calabrian Corp. v. United States,* 16 CIT 342, 346 n.4., 794 F. Supp. 377, 382 n.4 (1992).

tions.[7] In addressing separate like product challenges, the Commission stated that it "considered the asserted grounds for distinguishing various products in the context of the 'continuum' nature" of products in the cold-rolled steel like product grouping. *Final Det.* at 12. The Commission concluded that such a continuum properly reflected the "significant versatility of various carbon steel products that permit a wide variety of end uses." *Id.* The Commission further noted that

> [t]he Commission traditionally has been reluctant to fragment its like product definitions where a continuum of products exists. To do so would result in a large number of separate, specialized steel like products characterized by distinct metallurgy, end uses, and customer perceptions, and would ignore the need to identify 'clear dividing lines' between potential separate like products.

*Id.* at 11–12 (footnotes omitted).

In the final determination, the Commission found that seat belt retractor steel produced by Kern-Liebers was not a like product separate from other types of cold-rolled steel products subject to the investigation. *Id.* at 93–94. Seat belt retractor steel is a specialty hardened carbon steel used to make seat belt retractor springs. *Id.* at 93. Although the Commission noted that this steel, unlike other high carbon steel, was heat treated prior to being cold-rolled, the Commission found that this product had the same production processes, facilities and workers as that of other types of cold-rolled steel products. *Id.* at 93–94. The Commission further determined that the subject product was not distinguishable from other types of specialty or niche cold-rolled steel products that (1) have particular end uses, (2) were primarily distributed to end users, and (3) were sold with a price premium reflecting the "considerably greater energy usage required to produce these steels." *Id.* at 94.

Kern-Liebers does not contest that its product is made of cold-rolled steel. Rather, Kern-Liebers contends that its product is a more specialized carbon steel product with distinct qualities such as higher tensile strength,[8] superior cleanliness, unique uses, and a lack of interchangeability with other products, warranting a separate like product determination. Although this may be so, such qualities do not distinguish seat-belt retractor steel from other types of specialized cold-rolled steel products. Further, in addressing like product challenges, the Commission considered numerous specialty (niche) products that did not have identical matches in the domestic industry. *See id.* at 86–94. Separate like product categories were not carved out for these products.

Kern-Liebers also argues that because seat belt retractor steel is sold primarily to end-users, it is sold through channels of distribution different from those for other cold-rolled steel products. This fact, however,

---

[7] The Commission found four major like products—hot-rolled flat products, cold-rolled flat products, corrosion-resistant flat products and cut-to-length plate flat products. *Final Det.* at 11 & n.13. The parties to the investigation did not challenge the basic definitions of these products. *Id.*

[8] Kern-Liebers claims that the production equipment it uses to create tensile strength, a 20–1011 Senzimir type rolling machine, is not used by the domestic industry, which uses a 4-roll quarto type rolling machine. Kern-Liebers' Mot. J. Agency R. at 11 (Kern-Liebers' moving brief is entitled "Pre-Hearing Brief").

does not distinguish Kern-Liebers' product. The Commission found that, in general, specialty (niche) high-carbon products are primarily sold directly to end-users. *Id.* at 94.

Finally, Kern-Liebers contends that seat belt retractor steel is required to meet the Federal Motor Vehicle Specification 209 safety standard, thus a clear dividing line exists for separate like product classification. The court does not find this argument compelling. The fact that a particular specialty (niche) product may be dedicated to a specific and unique use may be considered, but is not necessarily determinative of whether a separate like product determination is warranted in this case. *See Asociacion Colombiana,* 12 CIT at 637–38, 693 F. Supp. at 1168–69 (noting that ITC like product determination depends upon unique facts of each case, though specific use is not, as matter of law, inappropriate as one of bases for like product distinction).

The court finds the distinctions drawn by Kern-Liebers constitute "minor differences" and do not merit a separate like product determination. *See Cambridge Lee Indus., Inc. v. United States,* 13 CIT 1052, 1055, 728 F. Supp. 748, 750–51 (1989) (noting that like product determination should not be narrowly interpreted "'as to permit minor differences in physical characteristics or uses to lead to the conclusion that the [domestic] product and [the imported] article are not "like" each other'") (quoting S. Rep. No. 249, 96th Cong., 1st Sess. 90–91 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 476–77). In this case, reliance on end use would lead to an excessively broad exclusion of other specialty (niche) products that are dedicated to particular uses. Thus, the Commission's determination that seat belt retractor steel was within the upper range of the continuum of cold-rolled steel products is supported by substantial evidence.[9]

## II. *Captive Production:*

In the final determination, the Commission included "captively consumed" cold-rolled steel production, used for further processing into downstream products,[10] in its assessment of the domestic cold-rolled steel industry. In part, petitioners raise the same arguments advanced in their challenge to the Commission determination in *U.S. Steel Group v. United States,* Slip. Op. 94–201, at 11–19 (Dec. 30, 1994). There the Commission had included hot-rolled captive production in its assessment of the domestic hot-rolled steel industry. *See Final Det.* at 18. To the extent that those arguments have been decided in *U.S. Steel Group,* the court will not revisit them here. The court, however, will address petitioners' additional arguments concerning profitability calculations.

---

[9] Kern-Liebers further contends that there is no domestic producer of seat belt retractor steel, thus its product cannot be causing threat to any U.S. industry. If seat belt retractor steel were found to be unlike other cold-rolled steel products, the lack of a domestic producer would be dispositive. However the court finds the Commission's single like cold-rolled product determination to be supported by substantial evidence, thus this issue is not reached.

[10] Approximately one-half of all domestic cold-rolled steel shipments was "consumed internally by integrated producers in the production of downstream products," mainly for corrosion-resistant steel products. *Final Det.* at 15 & n.37; Def.'s Conf. App., vol. 3, List 2, Doc. 216 at I–50 tbl. 9 *in* Defendant's Appendix vol. IV, *U.S. Steel Group,* Slip Op. 94–201 (Dec. 30, 1994) ("Conf. Staff Rpt.").

Petitioners contest the Commission's decision to estimate the profitability of captive transfers. Specifically, petitioners contend that by doing so the Commission created "fictitious" losses for captive production, thus masking the potential contribution of imports to material injury. Petitioners assert that the subject imports compete only with the merchant market portion of the domestic industry, not the captive portion, thus all losses are attributable to merchant market sales. According to petitioners, the Commission should have valued captive transfers at their cost of production ("COP") to arrive at zero losses for the captive production sector, rather than estimating profitability for this sector.

Under the statute, the Commission, in assessing impact of imports on the state of the domestic industry, must consider, *inter alia,* any declines in profits "within the context of the business cycle and conditions of competition that are distinctive to the [domestic] industry." 19 U.S.C. § 1677(7)(C)(iii) (1988). For this purpose, it is the Commission's practice, where a significant portion of domestic production is captively consumed, to estimate the profitability of transferred products in order to project the profitability of total domestic production.[11] *See Stainless Steel Wire Rod from Brazil, France, and India,* USITC Pub. 2599, Inv. Nos. 731–TA–636–638, at I–19 (Feb. 1993) (prelim.); *see also Tungsten Ore Concentrates from the People's Republic of China,* USITC Pub. 2447, Inv. No. 731–TA–497, at 10 & n.48, A–28–A–30 (Nov. 1991) (final) (employing analysis of domestic producers' profitability estimates for captive production, with adjustments). Because the Commission's assessment of the domestic industry properly includes the captive production within the like product definition, *see U.S. Steel Group,* Slip. Op. 94–201, at 13–14, 16, the court finds that the Commission's decision to estimate the profitability of captive transfers to be reasonable.[12]

---

[11] Subsequent to oral argument, petitioners raised the argument that the Commission's determination in *Fresh Garlic from the People's Republic of China,* USITC Pub. 2825, Inv. No. 731–TA–683 (Nov. 1994) (final) *("Fresh Garlic"),* demonstrates that the Commission need not have constructed financial data for cold-rolled captive transfers, but rather could have valued captive transfers at cost. The circumstances in *Fresh Garlic,* however, are distinguishable from the present case. The Commission found that there was "no reliable basis to value" raw garlic intended for production of dehydrated ("dehy") garlic, which is almost entirely consumed internally. *Id.* at I–22, II–35 & n.89. Supporting the Commission's conclusion was the fact that (1) there were no reported sales of dehy garlic and (2) dehydrated garlic producers were unable to segregate financial data with regard to dehy garlic production. *Id.* at I–23, II–35 & n.89. Thus, the Commission used the product line exception in 19 U.S.C. § 1677(4)(D) (1988) to examine the financial data of the narrowest group of products that contained the like product at issue, in this case the dehydrated garlic industry. *Fresh Garlic* at I–23.

In the present case, nearly one-half of all cold-rolled production involved reported merchant market sales. Conf. Staff Rpt. at I–50 tbl. 9. Further, domestic producers provided reliable COP data for captive transfers. Thus, the court finds that there existed a reasonable and reliable basis for the Commission to value cold-rolled captive production. Finally, petitioners' argument that *Fresh Garlic* indicates that the Commission should have made separate like product determinations for captively-consumed steel is without merit. *U.S. Steel Group,* Slip Op. 94–201, at 15 n.6.

[12] The court rejects petitioners' additional argument that *Certain Calcium Aluminate Cement and Cement Clinker from France,* USITC Pub. 2772, Inv. No. 731–TA–645 (May 1994) (final), provides a basis for the Commission to exclude captive production in its assessment of the domestic industry in this case. In that determination, the Commission found cement clinker destined to become calcium aluminate cement to constitute a separate like product from cement clinker production for use as flux, based on differences in chemical compositions, end uses, channels of distribution and customer perceptions. *Id.* at I–7 & n.14. The two types of clinker, however, were initially treated as separate classes of merchandise in Commerce's scope determination, without challenge. *Id.* at I–5–I–6.

In the present case, petitioners filed its petitions *without* distinguishing between merchant market and captive production. As the court stated in *U.S. Steel Group,* Slip. Op. 94–201, at 16, the like product definition is determinative of the industry to be examined. *See* 19 U.S.C. § 1677(4) (A); *Asociacion Colombiana,* 12 CIT at 636, 693 F. Supp. at 1167 (finding identification of like product necessary to determine which industry is examined for injury or threat of injury). Thus, petitioners' argument is without merit.

The court further rejects the petitioners' challenges to the Commission's selection and application of its methodology. In the final investigation, petitioners adamantly refused to provide any information with regard to the valuation of internal transfers, including sales value, operating income or cash flow. Pet'rs' Reply Br. at 62 & n.140; Letter to Lynn Featherstone from John Mangan and Michael H. Stein, List 2, Doc. 301GG at 2 (Jan. 21, 1993). As a result, the Commission collected data "on the profitability of trade sales and [COP] for both trade sales and transfers," U.S. Int'l Trade Comm., *Certain Flat-Rolled Carbon Steel Products: Final Report to the Commission* at I–35 tbl. 9, I–64 (1993) ("Pub. Staff Rpt."); *see* Pet'rs' Reply Br. at 62–63, and, although acknowledging that other methodologies existed, estimated the profitability of captive transfers based on a methodology selected as appropriate "to achieve a fair presentation of the data."[13] Pub. Staff. Rpt. at I–64.

Petitioners' contention that the unit value figures of "company transfers" from hot-rolled production must equal the COP figures of transfers "from hot-rolled operations" used in cold-rolled production is without merit. *Compare* Pub. Staff Rpt. at I–73 tbl. 29 *with id.* at I–78 tbl. 34. As indicated, the court rejects this view. *See* discussion, *supra,* at pp. 12–15. Further, the higher figures for company transfers cover values for (1) transfers for internal consumption in the production of other subject products, (2) transfers for internal consumption in the production of other products produced by the plant, (3) internal consumption as is, and (4) transfers to affiliates. Pub. Staff Rpt. at I–65 n.127.[14]

Based on the record, the court does not find that the Commission erred in the selection of its methodology, nor does it find the conclusions reached by the Commission as to treatment of captive production to be unsupported by substantial evidence. *See, e.g., NTN Bearing Corp. v. United States,* Slip. Op. 94–96, at 9 (June 8, 1994) (concluding agency had broad discretion in choice of methodology employed to fulfill its statutory mandate).

---

[13] The Commission calculated the profitability value for captive transfers using the following methodology:

1. The transfer value was the average for each firm of that firm's average per-ton trade sale unit value for each annual period, adjusted for any cost differentials between trade and transfer product. The transfer value used for some companies was less than the average unit value for trade sales because the captively consumed product did not go through the same final stages of production as the sold product, and was not allocated all the relevant fixed costs * * *. Verification adjustments of the large producers have generally added fixed expenses to the transferred products so that dissimilarities in cost relate primarily to actual processing differences.

2. The cost of transferred products was requested in the COP data and was used as the cost of goods sold. The underprocessing of the transferred product is adjusted by the lower transfer value.

3. No additional selling expense was allocated to the transferred product; however, general and administrative (G&A) expense was allocated based on the per-ton G&A expense of trade sales.

Pub. Staff Rpt. at I–64.

[14] Petitioners further assert that the Commission erred in its calculations of operating income and loss for total cold-rolled operations. *See* Pub. Staff. Rep. at I–79 tbl. 35. Petitioners contend that the Commission assigned a higher per-ton G&A expense to captive transfers than that required by the Commission's stated methodology, *see supra* note 13, thereby exaggerating the losses of the captive portion of the domestic industry. Even if correct, the court does not find this error to be prejudicial, as merchant market G&A expenses were unaffected. Further, the Commission stated that "[e]ven in the merchant market sector of the domestic industry, cumulated imports have not had a significant impact on the domestic industry because of their limited substitutability resulting from quality and other nonprice factors." *Final Det.* at 130 n.348. Thus, the Commission considered the impact of the subject imports on the merchant market, where imports competed more directly, to be insufficient to warrant an affirmative material injury determination.

III. *Present Material Injury:*

A. *Causation Analysis:*

Petitioners contend that the causation analyses of Commissioners Brunsdale and Crawford are not in accordance with law, and that Commissioner Watson's analysis is impermissibly vague. Petitioners raise the same arguments advanced in challenges to the Commission determination in *U.S. Steel Group*, Slip. Op. 94–201, at 45–46. The court has found no error in the standards applied by the Commissioners for their causation analyses. *Id.* at 46–48.

B. *Negligibility for Cumulation Purposes:*

Pursuant to 19 U.S.C. § 1677(7)(C)(iv) (Supp. V 1993),[15] the majority cumulated non-negligible imports from six countries: Brazil, Canada, Germany, Japan, Korea and The Netherlands. *Final Det.* at 108–09, 116. Imports from Argentina, Austria, Belgium, France, Italy, South Africa and Spain were found to be negligible and thus were not cumulated for the majority's material injury analysis. *Id.* at 109–14, 116–18.

Petitioners contest the majority's application of the negligibility exception of the cumulation provision as contrary to law and legislative intent. First, the interpretation and application of the negligibility exception in these investigations by the various Commissioners who made negative findings, although not uniform, are in accordance with law. *U.S. Steel Group,* Slip. Op. 94–201, at 31–33. Second, the court rejects petitioners' contention that *any* evidence of adverse impact, in the form of lost sales or underselling, precludes application of the negligibility exception. As the court stated previously, "[t]he determination of no adverse impact is a multifaceted one, and the court will not construct a *per se* rule." *Id.* at 40.

Petitioners further argue that the majority's negligibility findings for Argentina, Austria, Belgium, France, Italy and Spain, are unsupported by substantial evidence. In making its assessment of whether imports are negligible and have a discernible adverse impact, the Commission is to consider all relevant economic factors, including volume, market share, price sensitivity, evidence of underselling and overselling, substitutability, as well as whether imports were isolated and sporadic. *See* 19 U.S.C. § 1677(7)(C)(v). In the present case, the majority reviewed these factors and its application of the negligibility exception is supported by substantial evidence.

---

[15] The statute provides that the Commission "shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry." 19 U.S.C. § 1677(7)(C)(iv)(I). Under the negligibility exception to the cumulation provision, the Commission has the discretion not to cumulate countries whose imports "are negligible and have no discernable adverse impact on the domestic industry." *Id.* § 1677(7)(C)(v).

The majority found the domestic cold-rolled industry not particularly price sensitive.[16] *Final Det.* at 109. Further, the majority, stressing that no numerical "bright line" was used for determining negligibility, *id.* at 30, found relatively low or stable import volumes and small shares of apparent domestic consumption (which did not exceed 0.5% for any one country) for each of the non-cumulated countries. Pub. Staff Rpt. at I–137 tbl. 95, I–147 tbl. 105. Most countries, however, had neither sporadic nor isolated sales.

For Argentine imports, the percentage share of apparent domestic consumption declined to 0.1% in 1992. Pub. Staff Rpt. at I–147 tbl. 105. The Commission noted that imports from Argentina were "more sporadic than imports from other countries." *Final Det.* at 110. Although there was evidence of mixed underselling and overselling in pricing comparisons, the Commission declined to cumulate Argentina in light of extremely low import volume and market share, the somewhat sporadic nature of sales, and the limited substitutability between Argentine imports and domestic products. *Id.*

With regard to Austrian imports, the Commission found that import volume declined to only 2,330 short tons in 1992, representing statistically insignificant market penetration levels. Pub. Staff Rpt. at I–137 tbl. 95, I–147 tbl. 105. Despite finding one confirmed lost sale and mixed underselling and overselling, the Commission determined that Austrian imports were negligible because of extremely low volume and market share, and somewhat isolated, although not sporadic, sales. *Final Det.* at 110–11.

Belgian import levels declined to 0.4% in 1992 from 0.5% in 1991. Pub. Staff Rpt. at I–147 tbl. 105. Although finding Belgian imports somewhat substitutable with commercial grade domestic products, the Commission determined that competition with domestic products was attenuated, on the basis of affidavits produced by Belgian respondents indicating that certain Belgian imports have characteristics not provided by domestic products and that sales were made to customers for unique end use applications. *Final Det.* at 111–12. Petitioners counter that these affidavits were self-serving and that other purchaser responses indicated that Belgian imports were comparable in quality to domestic products. *See* Pet'rs' Mot. J. Agency R. at 52, 55 n.126. Nevertheless, the Commission determined that overselling by the Belgian imports in 23 out of 31 pricing comparisons supported its finding that competition was attenuated. *Final Det.* at 112. In light of Belgium's low market share, stable import volume, and the attenuated competition between Belgian imports and domestic products, the Commission deter-

---

[16] Commissioner Rohr found the relevant industry not particularly price sensitive, noting that cold-rolled products "still display[ ] some sensitivity to price but considerably less so than either plate or hot-rolled products." *Final Det.* at 153. Although not reaching a conclusion as to the price sensitivity of the cold-rolled market specifically, Commissioner Watson concurred in Commissioner Crawford's price sensitivity analysis and found all four like product markets "generally not price sensitive." *Id.* at 32 n.162. Commissioner Crawford found the cold-rolled market "not price sensitive." *Id.* at 342. Commissioner Brunsdale found that the cold-rolled industry was "not so price sensitive." *Id.* at 315. Finally, Commissioner Nuzum found the cold-rolled industry "moderately price sensitive." *Id.* at 362.

mined that Belgian imports were negligible and had no discernible adverse impact on the domestic industry. *Id*.

France's share of apparent domestic consumption similarly fell to 0.4% in 1992 from 0.5% in 1991. Pub. Staff Rpt. at I–147 tbl. 105. Import volumes increased in 1991 to 129,280 short tons before decreasing to 1990 levels in 1992 of 125,290 short tons. *Id*. at I–137 tbl. 95. The Commission found declining import penetration levels and predominant overselling by French imports. *Final Det*. at 113. Further, the Commission noted that a portion of those imports were niche products for which no domestic production was available. *Id*. Although it found evidence of three confirmed lost sales for France, the Commission noted that these sales involved very small volumes. *Id*. at 113 n.226. On the basis of low import volume and market share, attenuated competition between French imports and domestic production, and predominant overselling, the Commission found French imports to be negligible. *Id*. at 113.

Italian imports increased its share of apparent domestic consumption in 1992 to 0.2% from 1990 levels of 0.1%, while import volumes rose from 40,992 short tons in 1990 to 47,749 short tons in 1992. Pub. Staff Rpt. at I–137 tbl. 95, I–147 tbl. 105. The Commission also found a significant portion of Italian imports to be of commercial grade quality relatively substitutable with domestic products. *Final Det*. at 114. Further, Italian imports undersold domestic products in all eight pricing comparisons for sales to manufacturers/end-users, and two confirmed lost sales were established, involving 1,750 tons valued at $781,500. *Id*. Nevertheless, because of very low and stable volume, and low market share, the Commission determined that Italian imports were negligible and had no discernible adverse impact on the domestic industry. *Id*.

Spain accounted for a 0.2% share of apparent domestic consumption with an import volume of 32,347 short tons in 1992. Pub. Staff Rpt. at I–137 tbl. 95 & n.1, I–147 tbl. 105. Spanish imports were sold primarily to U.S. steel service or distribution centers and were concentrated in commercial grade quality, with no niche imports reported. *Final Det*. at 117–18. The Commission was persuaded by Spanish respondents' arguments that imports consisted of particular types of steel already planned for European customers, and thus not produced specifically for the U.S. market. *Id*. at 117. Although the relevance of this finding is unexplained by the Commission, contrary to petitioners' contention, this fact alone does not warrant remand. Although the Commission found Spanish imports to be moderately substitutable, and underselling in 18 out of 19 pricing comparisons, the Commission also determined that based upon Spain's very low volume and market share, Spanish imports were negligible and had no discernible adverse impact on the domestic industry. *Id*. at 118.

The court finds the majority's negligibility findings for the non-cumulated countries to be supported by substantial evidence. Accordingly, the

Commission's negligibility determinations for Argentina, Austria, Belgium, France, Italy and Spain are sustained.[17]

C. *Price Sensitivity and Substitutability:*

In the final determination, the majority found that the domestic cold-rolled industry was not particularly price sensitive. *See supra* note 16; *Final Det.* at 122 & n.307. Underlying this conclusion in the Commission's analysis of material injury was its finding that substitutability between cold-rolled products and domestic products is limited. *Final Det.* at 120. Petitioners contend that in past investigations of the carbon steel industry the Commission has found significant price sensitivity and substitutability. In support of this contention, petitioners have cited to numerous Commission investigations from the early 1980's where the Commission has found the carbon steel industry to be price sensitive and fungible.[18] Defendant and respondents counter that the Commission is not bound by its prior decisions and that the Commission nonetheless adequately explained its departure from these prior determinations.

The court has found that "'a particular circumstance in a prior investigation cannot be regarded by the Commission as dispositive of the determination in a later investigation.'" *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F. Supp. 1075, 1087 (1988) (quoting *Armstrong Bros. Tool Co. v. United States,* 84 Cust. Ct. 102, 115, C.D. 4848, 489 F. Supp. 269, 279 (1980)). Further, in reaching a determination, the Commission must conduct an independent evaluation of all relevant factors with respect to "the unique economic situation of each product and industry under investigation." *Alberta Pork Producers' Mktg. Bd. v. United States,* 11 CIT 563, 583, 669 F. Supp. 445, 461 (1987). Thus, the Commission is not obligated to follow prior decisions if the facts and circumstances warrant a different conclusion, however the court notes that in making this finding the Commission may not act arbitrarily. *See U.S. Steel Group,* Slip. Op. 94–201, at 50; *Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 1174, 1177, 704 F. Supp. 1068, 1071 (1988); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285–86 (1974) (agency must articulate rational connection between facts found and conclusion reached).

The court disagrees with petitioners' contention that the Commission "completely failed" to provide any reasoned analysis explaining its

[17] Petitioners further assert that the Commission improperly relied on "the relatively few confirmations of lost sales [as] further evidence of a lack of a discernable impact." Pet'rs' Reply Br. at 37 & n.87 (citing *USX Corp. v. United States,* 11 CIT 82, 88–94, 655 F. Supp. 487, 493–97 (1987)). Petitioners mischaracterize the Commission's consideration of lost sales. In its discussion of specific countries, the majority acknowledged in footnotes, where appropriate, that it could not confirm lost sales or lost revenue allegations. *See, e.g., Final Det.* at 110 n.193. The Commission did not rely exclusively on such facts to find negligibility.

[18] *See, e.g., Certain Carbon Steel Prods. from Spain,* USITC Pub. 1331, Inv. Nos. 701–TA–155, 157–160, and 162, at 16 (Dec. 1982) (final) (noting that "fundamental characteristic of each of the products under consideration is its inherent fungibility and price sensitivity"); *Certain Carbon Steel Prods. from Argentina, Australia, Finland, South Africa, and Spain,* USITC Pub. 1510, Inv. No. 701–TA–212 and Inv. Nos. 731–TA–169–182, at 8 (Mar. 1984) (prelim.) (noting "apparent fungibility and price sensitivity of these carbon steel products").

departure from past practice. During the voting, many Commissioners noted that the steel industry today is much different from ten years ago. Def.'s App., vol. 1, List 1, Doc. 1166, at 9–10, 22–23, 32–33 (Tr. of Proceedings Before U.S. Int'l Trade Comm. (July 27, 1993)). Further, the Commission considered a number of factors to support its findings that the cold-rolled industry was not price sensitive and had limited substitutability. To reach its determination as to limited substitutability, the majority found that (1) purchaser questionnaires showed that quality, not price, was most important in purchasing decisions, (2) certification and pre-qualification requirements limit an end-user's ability to switch between imports and domestic production, (3) the cumulated imports were "much more heavily concentrated" than the domestic industry in specialty (niche) products, and (4) cold-rolled products were almost never sold on speculation or to stock steel service center or end-user inventories. *Final Det.* at 120–22. Thus, the court finds that the majority did not act arbitrarily and articulated a rational connection between its findings and the conclusions reached. The issue now is whether the majority, in conducting its independent evaluation, based its conclusions upon substantial evidence. Each of petitioners' challenges will be addressed in turn.

First, petitioners contest the majority's interpretation of questionnaire responses finding that product quality was more important than price in purchasing decisions. In the final determination, the majority found that 71 responding purchasers listed "product quality" as "critical" to purchasing decisions, compared to 40 purchasers listing "price" as "critical." *Id.* at 122. The court finds no error in the Commission's consideration of this data. *See Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 1092, 699 F. Supp. 938, 953 (1988) (noting that court should not interfere with Commission's discretion to interpret reasonably evidence collected in investigation).

Second, petitioners contest the Commission's finding that certification and pre-qualification requirements[19] limit an end-user's ability to switch between imports and domestic production. In the final determination, the majority supported its conclusions with findings that (1) the requirements involved considerable time and expense to process, taking between six months and two years for major end-users, (2) a significant percentage of purchasers reported that they had not changed suppliers in the last five years, and (3) most purchasers maintained relatively few approved suppliers and generally did not switch suppliers from order to order. *Final Det.* at 121–22 & nn. 301–02.

Petitioners contend that the evidence cited by the majority regarding the certification/qualification process failed to include information on distribution/service centers, and thus is not representative of all purchasers' actual responses. According to petitioners, after inclusion of

---

[19] Certification and pre-qualification requirements are employed to enable end-users to ensure that products purchased from suppliers satisfy the internal quality and performance standards needed to produce end products. Pub. Staff Rpt. at I–165.

this data, time and costs associated with the qualification process are not so burdensome for *all* purchasers.[20] Although this may be so, the Commission did not err in focusing its inquiry on information as to end-users. As nearly 73% of all domestic cold-rolled merchant shipments were to end-users, compared to approximately 44% of import shipments, the court does not find the majority's analysis of the qualification process unreasonable. *See* Pub. Staff Rpt. at I–48 tbl. 14.

Third, petitioners challenge the majority's finding that the subject imports were much more heavily concentrated than the domestic industry in specialty (niche) products as opposed to commercial grade products. *Final Det.* at 120–21. In the final determination, the majority determined that the concentration of specialty (niche) products[21] for the cumulated countries ranged from 24.4% to 33.9% (depending on the countries cumulated by each Commissioner), compared to 8.4% in 1992 for the domestic industry.[22] *Id.* at 121 n.298. Petitioners argue that the majority miscalculated the domestic concentration figure by failing to include captively-produced ultra-thin steel[23] in the numerator of its calculation, even though the captive production amount was included in the denominator for total production.[24] Once this error is corrected, petitioners contend, 22.8% of the domestic industry is concentrated in specialty (niche) production. Defendant and respondents contend that petitioners are estopped from challenging the Commission's figure because the calculation was made using data reported by petitioners' questionnaire responses.

In the producers' questionnaires, domestic producers were requested to report all production of ultra-thin steel which was defined as "[a]n uncoated cold-rolled carbon steel flat product, such as 'tin mill black plate,' * * * that can be used as the substrate for tinplate (tin-coated steel), tin-free steel * * * or other coated flat products." Resp'ts' Apps. Accompanying Mem. P. & A., Tab 13, at 7 (Sample Producers' Questionnaire). Further, the questionnaires specifically requested that captive

---

[20] Eight of the top 15 distribution/service centers, based on total volume of purchases during the period of investigation, reported certification or pre-qualification requirements. Resp'ts' Joint Mem. P. & A. Opp'n Pet'rs' Mot. J. Agency R. at 76 n.87. The certification or pre-qualification process for this group ranged from one month to three months. *Id.* Petitioners argue that after inclusion of the distribution centers, for the top twenty purchasers the certification or pre-qualification process averaged about two months and the average processing costs were about $4000. *See* Pet'rs' Mot. J. Agency R. at 88 n.202.

[21] The majority examined the following specialty products: cold-rolled motor lamination steel, high carbon steel, ultra-thin steel, and Niche products 31–33, 35–38, 54–62. *Final Det.* at 121 n. 298.

[22] To determine the level of specialty and niche production in the cumulated imports, the majority divided the total production of those products by the total production of the cumulated countries in 1992. For the domestic industry, the majority apparently relied on the Respondents' Cold-Rolled Prehearing Brief as the source for the 8.4% figure. *See Final Det.* at 121 n.298 (citing Cold-Rolled Resp'ts Prehearing Br. at 24–25); *see also* Resp'ts' Apps. Accompanying Mem. P. & A. Opp'n Pet'rs' Mot. J. Agency R., Tab 15, at 25 (Cold-Rolled Resp'ts' Prehearing Br.).

[23] Approximately 93% of all ultra-thin steel production was captively consumed in downstream production of tin plate and tin-free steel. Pub. Staff Rpt. at I–23 & n.36 (citing American Iron and Steel Institute ("AISI") (statistics)

[24] Petitioners also contend that the majority actually overestimated the concentration of cumulated imports in specialty (niche) production. They argue that niche products 59 and 37 are in fact ultra-thin steel and were thus double-counted. Although this may be so, the error would change the majority's calculations by an insignificant percentage (less than 2%).

transfers of ultra-thin steel be reported.[25] *Id.,* Tab 13, at 4. Most domestic producers, however, failed to report any captive production or shipments of ultra-thin steel.

In fact, the Commission made a special effort to avoid error on this point. In a follow-up letter sent to domestic producers, the Commission specifically requested petitioners to identify whether "the industry report[ed] captively consumed tin mill black plate[26] in the cold-rolled data" because of concerns that producers' reported production could not be reconciled with AISI industry figures that indicated shipments of 3.9 million tons of tin mill black plate and its downstream products. *See* Resp'ts' Post-Oral Argument Subm. (Letter to Michael H. Stein and Robert E. Lighthizer from Lynn Featherstone, List 2, Doc. 301GG (July 1, 1993)). The domestic producers' response was that the producers' questionnaire requested "a separate break-out of 'ultra-thin' cold-rolled products." Def.'s App., vol. 3, List 2, Doc. 199, at 10 n.20 (Pet'rs Posthearing Br., vol. 4, Ex. 2). This contention is erroneous. As indicated, the producers' questionnaires specifically requested that ultra-thin captive production and captive transfers be reported. Furthermore, at no time during the proceedings did petitioners challenge the 8.4% figure, which was originally cited in Respondents' Joint Cold-Rolled Prehearing Brief and later relied upon by the majority. *See supra* note 22. The petitioners cannot now claim that the Commission erroneously failed to rely upon figures that the domestic producers declined to provide, despite two requests from the Commission. Thus the court finds that the Commission properly relied upon the production quantity of ultra-thin steel as reported by domestic producers in their questionnaire responses. *See* Conf. Staff Rpt. at C–7 tbl. C–5.[27]

Defendant did admit a relatively minor error in the calculation at oral argument, that is, it erroneously excluded captive transfers reported by USS-POSCO Industries. Correction of this error changes the domestic concentration figure in specialty (niche) products to approximately 10%. Changing the figure from 8.4% to 10%, however, does not undermine the majority's conclusion that cumulated imports were much more concentrated in specialty (niche) products than domestic production.

Lastly, in the final determination, the majority recognized that the cold-rolled market was primarily based on orders received from service centers or end-users and that products are "almost never sold on speculation or to stock steel service centers or end users inventories." *Final Det.* at 100, 120. Petitioners contend that this finding is evidence that

---

[25] The producers' questionnaire defined "company transfers" as "including 'captive shipments'" and "[s]hipments of products within or between your firm's plants, divisions, and/or related/affiliated companies." Resp'ts' Apps. Accompanying Mem. P. & A., Tab 13, at 4. "Captive shipments" were defined as "[s]teel that is used internally for further processing or transferred to a related/affiliated company for further processing." *Id.*

[26] Ultra-thin steel is also known as tin mill black plate. Pub. Staff Rpt. at I–23.

[27] Even though this error was petitioners' fault, the court also considered whether this error was so fundamental that justice requires a remand. The court concludes it does not. Imports were still more concentrated in niche categories and even in the merchant market the effects on the domestic industry were attenuated. *See supra* note 14.

the cold-rolled industry is a "custom market," that is, capable of producing all of the products at issue at the order stage, and thus "foreign and domestic products are *infinitely substitutable.*" Pet'rs' Mot. J. Agency R. at 96. Defendant counters that although domestic products had the *"theoretical* ability" to produce many specialty (niche) products, there was substantial evidence on the record supporting a finding that other factors, such as quality and availability, were important to purchasing decisions and thus the Commission properly concluded that substitutability was limited between domestic products and imports. The court agrees.

In the final determination, the majority noted that "a reliable source of supply with consistent quality is essential to most end users." *Final Det.* at 120. This finding is supported by the majority of purchaser questionnaire responses listing as "critical" and "very important" factors, such as product quality, supplier qualification, and current availability of the product, in making purchasing decisions. *See id.* at 122. The majority also cited evidence that some purchasers indicated that domestic producers were "unable to produce certain gauges and widths of cold-rolled products available in the cumulated imports." *Id.* at 125. Finally, the majority noted the fact that the domestic industry failed to report production of many specialty (niche) products imported by the cumulated countries. *Id.* at 126 & n.327. Thus, based upon these and other factors, the majority determined that there existed limited substitutability in the market. The court finds the majority's conclusion to be supported by substantial evidence.

Petitioners also challenge the separate substitutability analyses of Commissioners Brunsdale, Crawford and Watson. With regard to Commissioner Brunsdale, petitioners have not contested any specific findings regarding the substitutability of the cold-rolled industry, but rather contend that her general approach of analysis for substitutability in the various portions of her views is internally inconsistent. The court has found no error in Commissioner Brunsdale's substitutability analysis in these investigations. *U.S. Steel Group,* Slip. Op. 94–201, at 54–55.

Similarly, petitioners challenge Commissioner Crawford's substitutability analysis, with which Commissioner Watson concurred, because of an alleged flawed economic analysis, rather than any specific findings made by the Commissioners for the cold-rolled industry. Petitioners raise the same arguments rejected in *U.S. Steel Group. Id.* at 55–57.

### D. *Interim 1993 Data:*

Petitioners allege that the imposition of preliminary duties in December 1992 and February 1993 resulted in increased prices and market share for the domestic industry, thus conclusively showing that unfairly traded imports had a suppressing and depressing effect on domestic prices. In the final determination, the majority did not rely on this interim data reasoning that, as it did not collect any data outside the period of investigation ("POI"), it could not conclude "that the domestic

producers' ability to enforce price increases after bond requirements were in place definitely shows there was price suppression or depression during the period examined." *Final Det.* at 129 & n.343. Further, the Commission indicated that other factors may have influenced the domestic industry's recovery, such as improved economic conditions in 1993, and increased demand by large purchasers as evidenced by "increased lead times for receipt of cold-rolled products." *Id.* Finally, because "extensive evidence on the record suggest[ed] that the subject imports did not significantly suppress or depress prices during the period examined," the Commission declined to accept petitioners' assertions. Id. at 129.

The court generally has not required the Commission to rely on interim data because of concerns as to reliability. *See U.S. Steel Group,* Slip. Op. 94–201, at 65; *General Motors Corp. v. United States,* 827 F. Supp. 774, 781 (Ct. Int'l Trade 1993) (noting that Commission, as trier of fact, has discretion to discount unreliable interim data). Thus, the court does not find that the majority erred in failing to rely on the 1993 interim data.[28]

## IV. *Threat of Material Injury Analysis:*

### A. *Petitioners' Challenges:*

#### 1. Lack of Cumulation

For purposes of threat analysis, the Commission must consider ten enumerated factors, including other economic factors it deems relevant. 19 U.S.C. § 1677(7)(F)(i).[29] In addition, an affirmative threat determination must be based on "evidence that the threat of material injury is real and that actual injury is imminent." *Id.* § 1677(7)(F)(ii). Further, the Commission's determination may not be based on "mere conjecture or supposition." *Id.*

The statute further provides that "[t]o the extent practicable * * * the Commission may cumulatively assess the volume and price effects of imports from two or more countries." *Id.* § 1677(7)(F)(iv) (Supp. V 1993). For its threat analysis, the majority declined to cumulate imports

---

[28] On November 14, 1994, petitioners moved to strike certain statements made during oral argument in this case. The court notes that it did not consider those statements in rendering this opinion. Thus, the motion is moot.

[29] The statute provides that the Commission, in determining whether an industry in the United States is threatened with material injury by reason of imports, shall consider, among other relevant economic factors,

(I) [i]f a subsidy is involved, such information * * * as to the nature of the subsidy * * *,

(II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,

(III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country,

(VII) any other demonstrable adverse trends that indicate the probability that the importation * * * of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury,

(VII) the potential for product-shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) * * * or to final orders * * *, are also used to produce the merchandise under investigation,

    *            *            *            *            *            *

(X) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

19 U.S.C. § 1677(7)(F)(i) (footnotes omitted).

from any of the subject countries stating that the lack of uniformity of pricing trends and varying volume and market penetration trends among the subject countries "render meaningful cumulative analysis difficult." *Final Det.* at 132–33. This court has upheld the Commission's decision not to cumulate imports for threat purposes where significant disparities exist between the subject countries' volume increases or patterns of underselling. *See Torrington Co. v. United States,* 16 CIT 220, 229, 790 F. Supp. 1161, 1172 (1992), *aff'd,* 991 F.2d 809 (Fed. Cir. 1993); *Asociacion Colombiana,* 12 CIT at 1178, 704 F. Supp. at 1072. Also, for those countries not cumulated in its material injury analysis, the Commission found that the same negligibility factors supported its decision not to cumulate for threat. *Final Det.* at 133.

Petitioners contest the majority's decision not to cumulate imports from certain groups of countries. They argue that the similarity of trends between Canada and Korea, and the similarity between Belgium, Brazil, France, Italy and The Netherlands negates the majority's stated rationale that "lack of uniformity of pricing trends" supports its decision not to cumulate imports for purposes of its threat analysis. The court disagrees.

The statute and case law clearly contemplate that it is within the Commission's discretion to cumulate for purposes of threat analysis. The fact that petitioners are able to assemble certain subgroups of countries whose trends are somewhat similar does not indicate that the Commission abused its discretion in not cumulating imports from these countries. Furthermore, no specific subgrouping of countries was requested by petitioners.

Petitioners challenge specifically Commissioner Nuzum's negative threat determination for Canada. Commissioner Nuzum, in exercising her discretion to cumulate imports for her threat analysis, stated that she generally considered three factors:

> 1) [M]y determinations to cumulate for present injury; 2) the lack of evidence of cumulated adverse volume and price effects for present injury and the extent to which price and volume trends for individual countries suggest any contrary evidence; and 3) the condition of the domestic industries and whether the industries demonstrated any vulnerability to future adverse volume or price effects from imports.

*Id.* at 385. With regard to Canadian imports, Commissioner Nuzum stated that

> I decline to cumulate the cold-rolled imports from Canada * * * based on the lack of substantial evidence of similar adverse price effects. While imports from Canada showed significant margins of underselling for one product, the volumes upon which these margins were based were extremely small. Price trends for the Canadian products based on more substantial volumes showed consistent overselling.

*Id.* at 386.

Petitioners contend that the record clearly contradicts Commissioner Nuzum's finding that the volumes of underselling imports were "extremely small." Petitioners argue that the actual volumes of underselling imports represented a very significant percentage of total imports. Defendant and respondents counter that the volume figures petitioners cite are actually based on incorrect data in the Staff Report. The incorrect data, defendant contends, were submitted by a single importer who erroneously reported import volumes for two products. Conf. Staff Rpt. at N–60 tbl. N–60, N–62 tbl. N–62. The correct figures, according to defendant, support Commissioner Nuzum's conclusion that the volumes for underselling imports were in fact small.

In its questionnaire response, the importer erroneously reported shipments for two products in thousands of short tons. Def.'s App., vol. 3, List 2, Doc. 301.334, at Ex. D, Prod. 9, 11 (purchaser's questionnaire response). In the same questionnaire response, the importer's reported total domestic imports from Canada were far below the import volumes it reported for the two products. *Id.*, List 2, Doc. 301.334, at 14. Further, the volumes of the two imported products even exceeded the total reported imports for *all* cold-rolled steel from Canada. *Compare id.,* List 2, Doc. 301.334, at Ex. D, Prod. 9, 11 *with* Pub. Staff Rpt. at I–137 tbl. 95. Thus, the importer's figures were incorrect. Of the Commissioners in the majority, only Commissioner Rohr mentioned the erroneous volume of underselling imports. *Final Det.* at 156. Nonetheless, contrary to petitioners' contention, the court agrees with defendant that the importer erroneously reported the import volume amounts and that Commissioner Nuzum did not rely upon the incorrect volume figures. As a whole, the majority seems to have correctly perceived the volume of underselling or did not rely on the erroneous information.

## 2. Product shifting for Canada, France and Japan

Petitioners argue that the majority failed to adequately consider the statutory factor of product shifting in its negative threat determinations for Canada, France and Japan. For each of these countries, the majority considered product shifting a "theoretical possibility" given each country's affirmative material injury determinations for corrosion-resistant products. *Final Det.* at 142, 144, 147. Considering various factors, the majority stated, for each country, that the theoretical possibility to product shift was not a significant enough threat to support an affirmative threat determination. *Id.* at 142–44, 147. Among the reasons cited by the majority were that (1) substantial investment was normally made in corrosion-resistant steel production, (2) there existed a large incentive to produce higher value-added products to recoup investments in downstream production facilities and (3) facilities for producing corrosion-resistant products normally involved separate coating lines. *Id.* at 143–44, 147.

Petitioners assert that (1) as much of the production is integrated for these countries, no additional capital expenditures are necessary to

shift production, (2) the imposition of prohibitive duties creates the incentive to product shift, and (3) the incentive to product shift was intensified by weak home market and third country demand. Further, petitioners argue that the financial structure of the integrated firms provides incentive to maintain capacity utilization at the "hot end" of production (semi-finished hot-rolled steel used for substrate).

The court does not find that the Commission's conclusion finding product shifting unlikely is unsupported by substantial evidence. The Commission, though finding a theoretical possibility of product shifting, properly considered evidence discounting the likelihood that substantial product shifting would occur. *See U.S. Steel Group,* Slip. Op. 94–201, at 66–69 (sustaining Commission's consideration of product shifting from corrosion-resistant products in the hot-rolled investigation).

B. *Respondents' Challenges:*

1. Korea

a. Commissioner Rohr's determination

Dongbu challenges the affirmative threat determination made by Commissioner Rohr, contending that his findings are not supported by substantial evidence on the record. Specifically, Dongbu contests Commissioner Rohr's finding that imports from Korea are likely to enter the domestic market imminently at prices that will have a suppressing or depressing effect on domestic prices. In his examination of pricing comparisons for threat analysis, Commissioner Rohr found "considerable underselling" by Korean imports. *Final Det.* at 157. Dongbu argues that this is inconsistent with his conclusion that Korean imports "over[sold] the domestic products in more than half of the Commission's pricing comparisons." *Id.* at 154 (discussing negligibility).

Although Korean imports oversold domestic products in a majority of instances (approximately 60%), the two characterizations by Commissioner Rohr are not incompatible because the instances of underselling, while less than a majority, were not insignificant. Contrary to Dongbu's contention, the court does not find that Commissioner Rohr relied "exclusively" on the underselling and overselling data to support a finding of threat for Korea. Commissioner Rohr, rather, relied on several factors including the fact that Korean imports increased by quantity and by value during the POI to a 0.6% market share in 1992. *Id.* at 157; Pub. Staff Rpt. at I–147 tbl. 105. Commissioner Rohr also relied on Korea's steadily declining average import prices to support his finding that Korean imports will likely have a suppressing or depressing effect on domestic prices. *See id.* at 157; Pub. Staff Rpt. at I–137–I–138 tbl. 95.

Dongbu further contends that Commissioner Rohr's failure to find a "rapid" increase and the generally low market share for Korean imports do not support a finding of threat. The court has recognized, however, that even though an increase in imports is not found to be "rapid," the increase may still be considered a demonstrable adverse trend support-

ing an affirmative threat determination. *Metallverken Nederland B.V. v. United States,* 13 CIT 1013, 1029–30, 728 F. Supp. 730, 742–43 (1989); *see* 19 U.S.C. § 1677(7)(F)(i)(VII).

Finally, Dongbu challenges Commissioner Rohr's reliance on production capacity and capacity utilization figures to support a finding that exports to the United States would significantly increase. In conducting a threat analysis, the statute provides that the Commission must consider "any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States." 19 U.S.C. § 1677(7)(F)(i)(II). Commissioner Rohr found that in light of substantially increased productive capacity (projected to increase sharply in 1993), steadily declining capacity utilization rates, and declining home market demand, Korean shipments were likely to increase in favor of "exports to all regions including the U.S. market." *Final Det.* at 156–57. Although, as acknowledged by Commissioner Rohr, the significance of the U.S. market to Korea declined slightly, *id.* at 156 & n.21, the court does not find the Commission's conclusion unsupported.

Commissioner Rohr also noted other factors, that Dongbu does not specifically contest, to support his affirmative threat finding. The Commissioner found that the levels of inventories for Korea posed "a threat of additional dumped exports on the U.S. market." *Id.* at 157. Further, Commissioner Rohr noted that the possibility of some product shifting existed given the affirmative material injury determination for corrosion-resistant production. *Id.* Commissioner Rohr stated, however, that he "[did] not place great weight on this factor." *Id.* at 158. Finally, because the Commissioner informally cumulated Canada, Germany and The Netherlands[30] with Korea for purposes of his threat analysis, he considered the presence of unfairly traded imports from these countries "as another demonstrable adverse trend that would suggest a threat of material injury."[31] *Id.* at 156, 158. Based on the record taken as a whole, the court finds Commissioner Rohr affirmative threat determination for Korea to be supported by substantial evidence. *See Torrington,* 16 CIT at 226, 790 F. Supp. at 1170 (noting that Commission has discretion to determine relevance and significance of factors considered).

### b. Commissioner Newquist's determination

Dongbu also challenges the affirmative threat determination made by Commissioner Newquist, contending that his findings are not supported by substantial evidence on the record. In conducting his threat analysis, Commissioner Newquist formally cumulated imports from Belgium, Brazil, Canada, France, Germany, Japan, Korea and The

---

[30] In 1992 these three countries accounted for a 2.6% share of apparent domestic consumption (by volume) with a total import volume of 746,947 short tons. Pub. Staff Rpt. at I–137 tbl. 95, I–147 tbl. 105.

[31] Informal cumulation is a joint consideration of imports from various countries, which may have simultaneous impact, but only the subject country's imports will be found injurious. That is, a separate formal threat analysis is undertaken for each subject country, and that analysis may include a subsidiary joint analysis.

Netherlands. *Final Det.* at 300. Thus, Commissioner Newquist's analysis addressed the enumerated statutory threat factors with regard to the aggregate trends and imports of the cumulated countries. In addition to the enumerated threat factors, the Commissioner examined the domestic industry's access to capital markets based on industry and market perceptions of the presence of unfairly traded imports.[32] *Id.* at 294–97. Commissioner Newquist viewed such an analysis as "entirely consistent with the type of imminent injury anticipated by the threat rationale, particularly as it relates to the actual and potential negative effects on the industry's development and production efforts."[33] *Id.* at 297.

Based on his analysis, Commissioner Newquist determined that the cumulated countries' imports warranted an affirmative threat determination. The Commissioner found that increased volume and market share, the large volume of divertible exports, the significant presence of subsidies for many countries, large unused capacity, and the adverse effect on the domestic industry's ability to raise capital, supported his findings for threat. *Id.* at 300–02.

Dongbu contends that Commissioner Newquist relied heavily on his "access to capital markets" analysis to the exclusion of the other statutory factors, and that the conclusions reached by the Commissioner were highly speculative. As Dongbu admits, the Commissioner was not precluded from analyzing the impact of the cumulated imports on the domestic industry's access to the capital markets, as it is within his discretion to consider other relevant economic factors in addition to those specifically enumerated in the statute. 19 U.S.C. § 1677(7)(F)(i). The statute further provides, however, that an affirmative threat determination may not be based on "mere conjecture or supposition." *Id.* § 1677(7)(F)(ii).

Dongbu maintains that much of the evidence relied upon by Commissioner Newquist consisted of speculative, self-serving testimony. In support of his analysis, specifically his capital market analysis, Commissioner Newquist relied upon petitioners' questionnaire responses, testimony from two chief executive officers and a president of three petitioning companies, as well as four sworn affidavits from steel analysts and a managing director of leading U.S. investment banking firms. *Final Det.* at 294–97. This court has recognized, however, that "assessments of the credibility of witnesses are within the province of the trier of fact. This [c]ourt lacks authority to interfere with the Commission's discretion as trier of fact to interpret reasonably evidence collected in the investigation." *Negev Phosphates,* 12 CIT at 1092, 699 F. Supp. at

---

[32] For example, Commissioner Newquist relied on testimony indicating that "without the imposition of antidumping and countervailing duties, access to capital will be even more restricted, and the limited available capital even more costly." *Final Det.* at 297.

[33] Contrary to Dongbu's contention, the court does not find that Commissioner Newquist conducted an expanded cross-industry analysis in his "access to capital markets" discussion. It is clear from the separate industry determinations that a separate finding was made with regard to each industry's ability to raise capital. *Final Det.* at 299–306. Specifically, for the cold-rolled industry, Commissioner Newquist found marked declines in capital expenditures during the POI, thus supporting his conclusion that the "[capital] markets * * * restricted capital access." *Id.* at 301–02.

953 (citations omitted). Furthermore, the court does not find Commissioner Newquist's reliance on the largely uncontradicted testimony unreasonable. Dongbu's other challenges to Commissioner Newquist's analysis generally would require the court to address the appropriate weight to be afforded to the evidence. This court may not reweigh evidence relied upon by the Commission, rather it is the Commission that "must assess the quality of the evidence and give such weight to the evidence as it believes is justified." *Iwatsu Elec. Co. v. United States,* 15 CIT 44, 47, 758 F. Supp. 1506, 1509 (1991). The court finds Commissioner Newquist's reliance on the capital markets analysis to be supported by the record and not based on mere conjecture or supposition.[34]

Dongbu further claims that the other factors relied upon by Commissioner Newquist are unsupported by substantial evidence. Dongbu argues that three factors Commissioner Newquist relied upon to support his threat determination were heavily tied to his capital markets argument. As the court does not find Commissioner Newquist's capital markets analysis to be unreasonable, Dongbu's contentions that these factors are unsupported based on the "inherently flawed capital markets theory" is without merit.

The court finds no error with Commissioner Newquist's findings as to production and unused capacity, market penetration, and price suppression and depression. Commissioner Newquist properly considered substantial unused capacity among the cumulated countries. Although he did not state specifically that such unused capacity would lead to a "significant increase in imports," *see* 19 U.S.C. § 1677(F)(i)(II), the Commissioner apparently included this factor in reaching his threat determination. *See Negev Phosphates,* 12 CIT at 1083, 699 F. Supp. at 947 (upholding Commission finding, although it did not explicitly declare that volume of imports was significant, as agency's path was reasonably discernible). The explanations of the other Commissioners in the majority are more clear on this point and Commissioner Newquist's statements are not inconsistent with such views.[35]

The Commissioner also found that because of substantial shipments to non-U.S. markets, there was at least a potential for significant production to be shifted from other markets to the United States. *Final Det.* at 301. Evidence of imminency of such a shift was not well explained, but potential for shifting was but one of a number of factors considered. Furthermore, contrary to Dongbu's contention, the Commissioner need not find that market penetration increased rapidly. *See* discussion, *supra,* at p. 43. Dongbu alleges no error in Commissioner Newquist's finding as to

[34] Dongbu also contests Commissioner Newquist's reference to the industry's plummeting stocks following the Commission's determinations as validation of the correctness of the capital markets' perceptions. *Final Det.* at 297. Although Commissioner Newquist's reference to events occurring outside the POI may have caused needless confusion, the reference was made after the formal vote. Thus, the court does not find the reference sufficiently adverse to warrant remand.

[35] The court is aware of the somewhat different country mixes considered by the Commissioners in the majority, but finds such differences unimportant for this particular explanation, as Commissioner Newquist cumulated to the greatest extent.

price suppression or depression, but only asks the court to reweigh the significance of the evidence on the record, which the court declines to do. *See Iwatsu Elec.*, 15 CIT at 47, 758 F. Supp. at 1509.

Dongbu finally contends that Commissioner Newquist abused his discretion in cumulating Korea for purposes of threat because significant disparate trends existed between Korean imports and the other cumulated countries. Specifically, Korea argues that its 0.6% share of apparent domestic consumption, a majority of instances of overselling, and significant capacity utilization rates differ significantly from the other cumulated countries, and thus Korean imports warrant non-cumulation.

In making his cumulation determinations, Commissioner Newquist considered two factors:

> (i) whether there is competition between the subject imports themselves and the domestic like products; and (ii) whether the subject imports from each country are 'negligible.'

*Final Det.* at 260. With regard to Korea, the Commissioner found that there existed a reasonable overlap of competition between Korean imports and domestic products. *Id.* at 274. He further found Korean imports not negligible based on his findings that import volumes increased, Korea's share of apparent domestic consumption accounted for 0.6%, and mixed underselling and overselling data indicated "some degree of discernible adverse impact." *Id.* at 275. Dongbu does not contest these specific findings.

The court disagrees with Dongbu's contention that Commissioner Newquist must "address the critical threshold question of the existence of disparate trends in the data." Dongbu's Mem. P. & A. Supp. Mot. J. Agency R. at 62. Although disparate trends may form the basis for not cumulating imports for threat purposes, the court will not interfere with a reasonable exercise of the Commission's discretion to cumulate. For purposes of his threat analysis, Commissioner Newquist cumulated imports to the extent that reasonable overlap of competition existed and the evidence warranted a non-negligibility finding. The statute favors maximum cumulation, but recognizes the difficulties Commissioners may face in applying their particular modes of threat analysis in a cumulative framework. *See* H.R. Rep. No. 40, 100th Cong., 1st Sess., pt. 1, at 131 (1987) (indicating that, in requiring cumulation to extent practicable, Congressional intent is that Commission apply same principles regarding cumulation for threat as it would apply for material injury). Commissioners must exercise discretion as to cumulation for threat in the context of a variety of fact patterns. Commissioner Newquist's mode of analysis as applied to these facts is compatible with the statutorily-sanctioned broad approach to cumulation, that is, it is not unreasonable to find cumulation practicable here. Under these circumstances, the court finds that Commissioner Newquist reasonably exercised his

discretion to cumulate Korean imports and, based on the record as a whole, that his decision is supported by substantial evidence.

c. Commissioner Nuzum's determination

Dongbu challenges Commissioner Nuzum's affirmative threat finding for Korea, contending that her findings are also not supported by substantial evidence on the record. For purposes of her threat analysis, the Commissioner cumulated Belgium, Brazil, France, Germany, Italy, Korea, The Netherlands and Spain. *Final Det.* at 386. The Commissioner found a "preponderance of underselling" among the cumulated imports. *Id.* at 388. Dongbu contends that the record contradicts this finding, arguing that the ratio of underselling (55%) to overselling (45%) "is, at worst, 'mixed.'" Dongbu's Mem. P. & A. Supp. Mot. J. Agency R. at 66. With regard to Korea, Commissioner Nuzum specifically noted the majority of overselling, however, she nevertheless found the underselling data to be significant. *Final Det.* at 386. Commissioner Nuzum further found that average import prices for the cumulated imports "declined more steeply than prices of domestic products" and were "closely tracking domestic prices." *Id.* at 386, 388. Although the pricing comparisons could possibly be characterized as "mixed," the court finds that the totality of evidence supports Commissioner Nuzum's finding of price suppression and depression by reason of the cumulated imports.

Dongbu also challenges Commissioner Nuzum's finding that significant unused or underutilized capacity will lead to increased imports to the U.S. market. *Id.* at 387. The Commissioner relied upon the fact that unused capacity exceeded 6 million tons for the cumulated countries, compared to the approximately 1 million tons of export shipments to the United States. *Id.* Given the rapid increase in export volumes to the United States for the cumulated countries near the end of the POI, *id.*, the court finds it reasonable for Commissioner Nuzum to infer that a substantial portion of future increased capacity would be devoted to export shipments to the United States.

In addition, Commissioner Nuzum found (1) with the exception of France, increased import volumes for each of the cumulated countries in 1992, (2) increased market share for the cumulated imports, accounting for 4.4% in 1992, (3) the existence of subsidies, substantial in some cases, for all the cumulated countries except one, and (4) the possibility of negative effects on existing development and production efforts. *Id.* at 386–88. Contrary to Dongbu's contentions, the court does not view these findings as inconsistent with Commissioner Nuzum's material injury findings.

Lastly, Dongbu argues that Commissioner Nuzum improperly cumulated Korean imports with the other subject imports. As indicated with regard to the discussion of Canadian imports, for purposes of her threat analysis, Commissioner Nuzum generally considers three factors. *See* discussion, *supra*, at p. 38; *Final Det.* at 385. Dongbu contends that the

Commissioner should not have ascribed the divergent trends from the cumulated countries to Korea, whose trends were disparate from the others. Underlying Dongbu's arguments are its contentions that (1) Korean products oversold domestic products in a majority of instances, and (2) Korea's capacity utilization figures were significantly higher than the other cumulated countries.

Although Commissioner Nuzum noted that no individual country exhibited significant adverse volume effects during the POI, she did note that many of the cumulated countries showed a majority of underselling instances. *Final Det.* at 385–86. The Commissioner also found that "price trends for these same countries—and Belgium, France and Korea—showed marked declines from 1990 to 1992." *Id.* at 386. Even though Korea did not exhibit a majority of instances of underselling, and assuming *arguendo* that disparate trends may require non-cumulation in some circumstances, the court does not find sufficient disparateness to require non-cumulation. As the court noted previously, Commissioner Nuzum reasonably considered Korea's underselling to be significant. Further, the Commissioner reasonably concluded that Korea's declining price trends, along with the other cumulated countries, weighed in favor of cumulation. Dongbu does not contest the finding of declining price trends.

Dongbu also contends that Commissioner Nuzum erred in cumulating Korean imports because Korea's capacity utilization figure was significantly higher in 1992 than that of the cumulated countries, which she found to have "significant unused/underutilized capacity." *Id.* at 387. The court does not find this argument compelling. As indicated, the Commissioner found declining price trends to weigh heavily in her decision to cumulate the subject countries. Commissioner Nuzum weighed a variety of conflicting factors and arrived at a reasonable decision to cumulate. Based on the evidence taken as a whole, the court finds Commissioner Nuzum's affirmative threat finding with regard to the cumulated imports to be supported by substantial evidence.

### 2. The Netherlands

#### a. Adequacy of the investigation

Hoogovens contests the Commission's affirmative threat determination for The Netherlands as not supported by substantial evidence on the record. As a threshold matter, Hoogovens challenges the Commission's investigation of pricing data with respect to The Netherlands. Because the pricing data collected by the Commission represented a very small percentage of total Dutch imports, Hoogovens asserts that the Commission's finding that "most imports from The Netherlands undersold domestic products" is unsupported by substantial evidence. *Final Det.* at 116. Defendant counters that because Hoogovens had full knowledge of the inadequacy of the pricing data with respect to Dutch products early in the proceedings, yet failed to raise the issue until its prehearing brief, it is estopped from making this argument.

On December 11, 1992, the Commission distributed draft questionnaires to petitioners and respondents requesting pricing data for four cold-rolled products. Respondents filed comments on January 21, 1993, requesting that two products be retained, the other two eliminated, and that three additional products and eleven specialty (niche) products be added. The Commission added two of the three additional products, eliminated one of the two products that respondents asked to be eliminated, and added other specialty (niche) products in addition to the eleven that respondents requested. Respondents also requested that the Commission add and/or substitute other products for the pricing comparisons. The Commission declined to add any products, but it did substitute one product requested by respondents. E-mail to Joseph Baremore from Jonathan Seiger, List 2, Doc. 301P (Feb. 3, 1993) (regarding pricing comparisons). The Commission subsequently issued the revised questionnaires requesting pricing data based on a selection of five cold-rolled products,[36] *see* Pub. Staff. Rpt. at I–169–I–170, as well as unit value and quantity data for 19 cold-rolled specialty (niche) products. *See id.* at F–6–F–7, F–8–F–9. Hoogovens, who produced only some of the five cold-rolled products, returned its questionnaire in a timely fashion. *See* Hoogovens' Mem. P. & A. Supp. Mot. J. Agency R. at 26–27.

On March 25, 1993, Hoogovens requested that the definition for a particular specialty (niche) product be revised. The Commission agreed and issued supplemental questionnaires on April 8, 1993, requesting additional information on certain specialty (niche) products. Following additional revision requests by respondents on May 3, 1993, the Commission issued another set of supplemental questionnaires shortly thereafter. Hoogovens filed a prehearing brief on June 18, 1993, raising, for the first time, the inadequate sample size of Dutch imports collected for pricing comparisons. Hoogovens does not contest the accuracy of the pricing data, only the representativeness of the data. Hoogovens' Mem. P. & A. Supp. Mot. J. Agency R. at 20.

Hoogovens should have been aware as early as February 1993, when the Commission issued its initial questionnaire, that the products selected for pricing comparisons were a very small sample of its total imports. Thus, Hoogovens undoubtedly had ample opportunity to inform the Commission of this fact. Hoogovens failed to do this until after all questionnaires were distributed, even though two sets of supplemental questionnaires were issued by the Commission to rectify other deficiencies.

As to core issues, however, the fact that Hoogovens failed to make a "specific and seasonable request is not dispositive." *General Motors,* 827 F. Supp. at 781. As the court noted, the Commission bears the burden to collect all data necessary to its investigation. *Id.* Thus, the court does not find that Hoogovens' failure to notify the Commission of the scant

---

[36] The Commission indicated that the products were selected in order to "represent items with the largest volumes of domestic and subject foreign producers' U.S. shipments, and which most accurately represent competitive conditions between domestic and subject foreign products in the U.S. market." Pub. Staff Rpt. at I–168 n.219.

data collected for The Netherlands completely relieves the Commission of its burden.[37]

The court turns to the adequacy of the Commission's investigation. Based on the pricing data collected for The Netherlands, the Commission found that in 22 out of 27 instances, Dutch imports undersold domestic products. *Final Det.* at 159. As indicated, Hoogovens does not contest the accuracy of this data. Furthermore, the only data Hoogovens submitted, to support its claim that the pricing data, though accurate, was unrepresentative of its total imports, were the generalized affidavits by the company presidents of two of Hoogovens' major purchasers. These affidavits indicated that Hoogovens' products were purchased at a price premium. Hoogovens' Conf. App. to Mem. P. & A. Supp. Mot. J. Agency R., Tab 4, Ex. 12 at 2, Ex. 15 at 3 (Exs. to Hoogovens' Prehearing Br.). While those statements could be viewed as applicable to at least one-half of Hoogovens' U.S. sales, no specific information was submitted, such as invoices, volume data, quarterly price data, unit value figures, point of purchase comparisons, or even dates when the premiums were alleged to have been paid. In the final determination, the Commission dismissed Hoogovens' arguments that "the majority of its products [did] not compete because they sell at a price premium," relying instead on the pricing data as collected. *See Final Det.* at 116. Further, pricing data collected during the preliminary investigation, based on a wider sample of Hoogovens' imports, indicated similar patterns of underselling, with Dutch imports underselling domestic products in 36 out of 45 pricing comparisons.[38] *See* Def.'s App., vol. 2, List 2, Doc. 73, at I–284–I–288 tbls. 120–25 (Conf. Prelim. Staff Report).

The court notes that "Congress set no minimum standard by which to measure the thoroughness of a Commission investigation." *Granges Metallverken AB v. United States,* 13 CIT 471, 481, 716 F. Supp. 17, 25 (1989) (finding that Commission conducted thorough investigation even though Commission collected pricing data for Swedish brass producers covering only eight out of possible 126 quarters). A presumption of correctness, however, is assigned to Commission determinations, thus the party challenging the determination must show that it is unsupported by the record or not in accordance with law. *See* 28 U.S.C. § 2639(a)(1) (1988); *Hannibal Indus., Inc. v. United States,* 13 CIT 202, 209, 710 F. Supp. 332, 337 (1989).

In the present case, Hoogovens has not demonstrated that the pricing data collected by the Commission, even though based on a small sample size, was in fact unrepresentative of total Dutch imports. The affidavits submitted by Hoogovens were of uncertain probative value and lacked much of the specific information the Commission uses in conducting

---

[37] The court does believe, however, that it should keep this background matter in mind, so that the test for adequacy may be somewhat less stringent in such circumstances.

[38] Included in this preliminary data were the imports of full-hard cold-rolled steel products that Hoogovens now seeks to have remain in the pricing data in the final determination. *See* Hoogovens' Reply Br. at 29–30 & n.26, 37. Due to the narrowing of the product definitions in the drafting of the questionnaires, full-hard imports were excluded.

pricing comparisons. Given the inadequacy of the information submitted by Hoogovens, the preliminary pricing data and Hoogovens' role in contributing to the small sample size, the court finds that the Commission could reasonably conclude that further investigation was not required. *See Granges Metallverken,* 13 CIT at 481, 716 F. Supp. at 25 (noting that Commission has broad discretion to pursue investigation in manner that will provide substantial evidence for its determinations). The issue now is whether the individual Commissioners' determinations based on the evidence, taken as a whole, are supported by substantial evidence.

### b. Commissioner Newquist's determination

Hoogovens challenges Commissioner Newquist's affirmative threat finding for The Netherlands, contending that his findings are not supported by substantial evidence on the record. Hoogovens contests Commissioner Newquist's finding of non-negligibility for The Netherlands. As indicated, in making his cumulation determination for purposes of threat, Commissioner Newquist considers the extent that reasonable overlap of competition exists between the imports and domestic products, and whether the imports were negligible. *Final Det.* at 260. With regard to the pricing data for The Netherlands, the Commissioner stated that "evidence of mixed under and overselling indicates some level of discernible adverse impact on the domestic industry." *Id.* at 275.

The Commissioner also relied upon findings that (1) there existed reasonable overlap of competition between Dutch imports, other subject imports, and domestic products, (2) import volumes increased, although irregularly, during the POI, (3) as a share of domestic consumption by quantity and value, Dutch imports never fell below 0.5% during the period examined, and accounted for 0.6% in 1992, and (4) Dutch sales were neither sporadic nor isolated. *Id.* Contrary to Hoogovens' contention, the court finds that this evidence, taken as a whole, could reasonably support a non-negligibility finding for The Netherlands.

Hoogovens also challenges Commissioner Newquist's use of an average non-weighted unit value ("AUV") for the cumulated countries in his threat analysis. The Commissioner found that because of the greater decline in the AUV for the cumulated imports, as compared to the decline of the domestic AUV, imports likely would lead to suppression or depression of domestic prices. *Id.* at 301. Hoogovens argues that use of the AUV was unreasonable because (1) it was unrepresentative of the imports' product mix, (2) the AUV was not weighted to reflect volumes, and (3) the use of a single AUV for all of the cumulated countries obscured actual pricing trends. Defendant and petitioners counter that past practice and case law support use of AUVs.

Although courts have recognized that the use of AUVs in price comparisons can support Commission findings, none of the cases defendant and petitioners cite specifically support use of a single AUV for a wide variety of products from a significant number of countries. *See, e.g.,*

*Maverick Tube Corp. v. United States,* 12 CIT 444, 453–54, 687 F. Supp. 1569, 1578–79 (1988); *Philipp Bros., Inc. v. United States,* 10 CIT 485, 489, 640 F. Supp. 1340, 1344 (1986). Generally, the use of AUVs has not been so broad and expansive as used by Commissioner Newquist in the present case. *See, e.g., Stainless Steel Flanges from India and Taiwan,* USITC Pub. 2724, Inv. Nos. 731–TA–639 and 640, at I–19 (Feb. 1994) (final). Thus, other evidence supporting the Commissioner's conclusion is required.

The Commission noted that Hoogovens "admitted that a substantial percentage of its imports were of generic cold-rolled steel that competed with the domestic like products." *Final Det.* at 115. As the questionnaire data sought pricing data for commodity grade products, the court does not find that, on a country-specific basis, the product mix of Dutch imports was obscured. Further, average import prices from The Netherlands, on a country-specific basis, declined at a faster rate than domestic products. *Compare* Pub. Staff Rpt. at I–138 tbl. 95 *with id.* at I–55 tbl. 16. Thus, the use of a single AUV for price comparisons was not likely to have been prejudicial as to The Netherlands.

Hoogovens makes no specific challenges to Commissioner Newquist's findings with regard to any other threat factors for the cumulated countries. The court concludes that based on the record taken as a whole, Commissioner Newquist's affirmative threat determination for The Netherlands is supported by substantial evidence.

### c. Commissioner Rohr's determination

Hoogovens challenges Commissioner Rohr's finding of affirmative threat for The Netherlands. Hoogovens contests the Commissioner's finding that the evidence indicated The Netherlands shifted exports away from third-market countries to the United States. *Final Det.* at 158. In support of his conclusion, Commissioner Rohr found that, as a share of total shipments, exports to third-market countries declined during the POI, while exports to the United States increased by quantity and as a share of total Dutch shipments. *Id.* Further, the Commissioner's finding that home market shipments accounted for a relatively low share of total shipments was not unreasonable as the share was lower than that of most of the subject countries. *See, e.g.,* Conf. Staff Rpt. at I–140 tbl. 49; Pub. Staff Rpt. at I–112 tbl. 70. Commissioner Rohr also noted that projected increasing inventories in 1993 posed a threat in light of the increasing exports to the United States and declining Dutch import prices. *Final Det.* at 159. From this evidence, Commissioner Rohr could reasonably conclude that exports were being and would continue to be diverted to the U.S. market.

Commissioner Rohr further found that The Netherlands' market penetration levels increased during the period examined to reach 0.6% in 1992. *Id.* at 158. He also based his determination in part on Dutch pricing data, noting that it showed declining AUVs for Dutch imports compared to domestic AUVs and underselling "in 22 out of 27 quarterly

pricing comparisons." *Id.* at 159. As indicated, reliance on the pricing data was not improper. *See* discussion, *supra,* at pp. 55–60. These findings supported his conclusion that Dutch imports are likely to enter the United States at prices that will have a suppressing or depressing effect on U.S. prices. Additionally, the Commissioner also noted that as he informally cumulated Canada, Germany and The Netherlands for purposes of his threat analysis, *see* discussion, *supra,* at p. 44, he considered the presence of unfairly traded imports from these countries "as another demonstrable adverse trend that would suggest a threat of material injury." *Final Det.* at 156. Finally, the court does not find Commissioner Rohr's findings inconsistent with his material injury findings. Based on the evidence on the record taken as a whole, the court finds Commissioner Rohr's affirmative threat finding for The Netherlands to be supported by substantial evidence.

### d. Commissioner Nuzum's determination

Lastly, Hoogovens challenges Commissioner Nuzum's affirmative threat determination. As indicated, Commissioner Nuzum, in exercising her discretion to cumulate imports, generally considers three factors, one of which is her present injury cumulation finding. *Id.* at 385. Hoogovens argues that Commissioner Nuzum's evaluation of "whether [imports] *discernibly contribute* to the adverse impact that the other, cumulated imports are having on the domestic industry" in her present injury cumulation and negligibility analysis is contrary to law. *See id.* at 357.

Commissioner Nuzum engaged in a cumulated analysis of volume and price effects for present injury purposes for most countries involved in the investigation of the four separate like products alleged by petitioners. *Id.* at 360–371. She takes a narrow view of negligibility. Hoogovens' complaint is that Commissioner Nuzum is failing to apply the statute properly because, for purposes of negligibility, she does not look at countries individually.

The court finds that Commissioner Nuzum does indeed do a particularized analysis, but in exercising her discretion not to find negligibility where to do so would do violence to the principle of cumulation, she applies an additional test. In that test she determines whether, when combined with other imports, the imports at issue discernibly contribute to an adverse impact. This appears to the court to fall within her discretion to cumulate. Particularly in a case such as this, where all foreign countries have small shares of the U.S. market, and no country's imports are truly dwarfed by another's, *see* Pub. Staff Rpt. at I–147 tbl. 105, exercising one's discretion not to find imports negligible is not likely to be an abuse of such discretion. *See also* discussion of statutory approval of maximum cumulation practicable, *supra,* at pp. 49–51.

Hoogovens also contests Commissioner Nuzum's decision to cumulate imports from The Netherlands for purposes of her threat analysis based on pricing trends. Significant in Commissioner Nuzum's decision

to cumulate cold-rolled imports from the cumulated countries, including The Netherlands, was her finding that most of the countries had significant underselling and declining price trends. *Final Det.* at 386. As the court does not find the pricing data for Dutch imports deficient, *see* discussion, *supra,* at pp. 57–60, and Hoogovens does not challenge other factual findings, based on the evidence on the record taken as a whole, the court finds Commissioner Nuzum's affirmative threat finding for The Netherlands to be supported by substantial evidence.

### 3. Germany

#### a. Determinations by Commissioners Watson and Rohr

Thyssen contends that the affirmative threat determinations of Commissioner Watson and Commissioner Rohr are not supported by substantial evidence. Specifically, Thyssen challenges the Commissioners' threat findings as to capacity utilization, market penetration, price effects, inventory levels, product shifting, and the effects on existing development and production efforts of the domestic industry. The court will address each challenge in turn.

Thyssen argues that the Commissioners mischaracterized Germany's capacity utilization rates during the period of investigation as "relatively low." *Final Det.* at 133; *see* Pub. Staff Rpt. at I–112 tbl. 70. Thyssen argues that this is inconsistent with Commissioner Watson's finding that Canada's projected 1993 capacity utilization rate was very high. *See Final Det.* at 141. The court disagrees. The Commissioners' characterization of Germany's capacity utilization rates as "relatively low," *during the period of investigation,* is not unsupported. Germany's rates during the period examined, which ranged from 74.4% to 77.8%, were low and steady. Pub. Staff Rpt. at I–112 tbl. 70. In fact, the court might call them very low for this industry. Further, Commissioner Watson's reference was to Canada's 1993 projected capacity utilization rate, which was at odds with the actual rates during the period of investigation. *See* Conf. Staff Rpt. at I–163 tbl. 61. Thus, the court does not find Commissioner Watson's analysis to be internally inconsistent.

Thyssen also asserts that the evidence cited by the Commissioners does not support a finding that German imports were likely to increase to injurious levels. Thyssen argues that the "mere presence" of unused capacity cannot support the Commissioners' affirmative threat finding in the absence of "'positive evidence tending to show an intention to increase the level[s] of importation.'" Thyssen's Br. at 16 (quoting *American Spring Wire Corp. v. United States,* 8 CIT 20, 28, 590 F. Supp. 1273, 1280 (1984), *aff'd sub nom. Armco, Inc. v. United States,* 760 F.2d 249 (Fed. Cir. 1985)). Although this may be so, evidence does exist to support the Commissioners' finding in this regard and the determination as a whole. The Commissioners found that during the period of investigation Germany shifted exports from the home market and third-country markets to the United States. *Final Det.* at 134. In support of its conclusion, the Commissioners cited evidence that home market shipments

declined due to weak and falling home market demand. *Id.* The Commission noted that as a share of German production, shipments to third country markets declined while exports to the United States increased. *Id.* Further, market penetration by German imports, by quantity, increased to 1.2% in 1992. Pub. Staff Rpt. at I–147 tbl. 105. Taken together, evidence of low capacity utilization, evidence of increase in U.S. exports and market share, and declining home market demand are supportive of a threat finding. *See Metallverken Nederland B.V. v. United States,* 14 CIT 481, 485, 744 F. Supp. 281, 284–85 (1990) (noting that Commissioner need not show that unused capacity supports affirmative determination so long as other economic factors support threat finding).

In finding that German imports will likely have a suppressing or depressing effect on U.S. prices in the immediate future, the Commissioners relied upon evidence that (1) German average import prices declined steadily, (2) pricing comparisons showed more instances of underselling (71) than overselling (64), and (3) many products were fungible commodity grade products, as compared to those of Japan, and, thus, were directly competitive with domestic products. *Final Det.* at 134. First, the court disagrees with Thyssen that because its AUVs were higher than U.S. prices, the Commissioners' finding is unsupported by substantial evidence. Germany's AUVs for its imports declined steadily, and at a much more rapid rate than did domestic prices. *Compare* Pub. Staff Rpt. at I–138 tbl. 95 *with id.* at I–55 tbl. 16. Further, as the court noted in its discussion of The Netherlands, *supra,* the use of individual country AUVs does not compel the court to find pricing comparisons inadequate.[39]

Second, Thyssen's product-by-product analysis of pricing comparisons does not convince the court to find that the Commissioners' reliance on generally more instances of underselling than overselling was unreasonable. Finally, Thyssen does not contest the Commissioners' finding that German imports were concentrated in relatively fungible commodity grade products. Based on these factors, taken as a whole, the court does not find the Commissioners' finding that German imports will likely have a suppressing or depressing effect on U.S. prices to be unsupported by substantial evidence.

The court rejects Thyssen's contention that the Commissioners improperly relied on increasing inventories in Germany, rather than "in the United States," as directed by the statute. *See* 19 U.S.C. § 1677(7)(F)(i)(V). "The provision directing the Commission to consider inventories in the United States does not preclude consideration of 'other relevant economic factors.'" *Citrosuco Paulista,* 12 CIT at 1225, 704 F. Supp. at 1099 (quoting 19 U.S.C. § 1677(7)(F)(i) (Supp. IV 1986)). Further, the court disagrees with Thyssen that the projected increase in

---

[39] Thyssen argues that the AUVs utilized by the Commission do not allow price comparisons at the same level of competition in the United States. Thyssen's Reply Br. at 15 & n.9. Thyssen does not explain why the "landed, duty paid values" used to calculate AUVs are not probative.

inventories cannot serve as an "indicia of threat," because they were below 1990 and 1991 levels. *See* Conf. Staff Rpt. at I–180 tbl. 70. The issue is how this data is considered in the context of other data.

Thyssen also challenges the Commissioners' finding that German production of corrosion-resistant products was likely to be shifted to the U.S. in the form of cold-rolled exports. *Final Det.* at 134–35. The Commission noted that German exports of corrosion-resistant steel to the United States were projected to decline in 1993. *Id.* The Commissioners also noted that "[t]he increase in German production of corrosion-resistant products between 1990 to 1992 was accounted for almost exclusively by increases in sales in the U.S. market." *Id.* at 134. Thyssen argues that this statement is inaccurate and thus this finding is unsupported by substantial evidence. Defendant has admitted that this statement is incorrect. The increase in German production of corrosion-resistant steel was primarily accounted for by increases in sales to the German home market, rather than the United States. *See* Conf. Staff Rpt. at I–182 tbl. 71. The court, however, does not find this error to be significant as the Commissioners did not rely heavily on this factor. The Commission qualified its product shifting discussion by stating that "we regard the other evidence of threat to be a sufficient basis to make an affirmative threat finding in this case." *Final Det.* at 135.

Finally, Thyssen contends that Commissioners' discussion of the potential negative effects German imports will have on existing development and production efforts of the domestic industry is inconsistent with the same discussion as to Canada. The court disagrees. The Commissioners based their conclusions, in part, on their findings that Canadian imports were small in volume and, thus, neither were they a factor in the decline of domestic capital expenditures nor were they "likely to contribute to further declines." *Id.* at 143. In contrast, the Commissioners' noted the size and nature of German imports, as well as the potential for German imports to rise to injurious levels. *Id.* at 135. Based on these facts, the Commission found German imports to be potentially harmful to planned improvements to be commenced or completed by the domestic industry beginning in 1993. *Id.* The court does not find the Commissioners' findings to be inconsistent.

Based on the record taken as a whole, the court finds the affirmative threat determination for Germany by Commissioners Rohr and Watson to be supported by substantial evidence in the record.

### b. Determinations by Commissioners Newquist and Nuzum

Thyssen contends that Commissioner Nuzum improperly cumulated German imports with the other subject imports. Thyssen contends that sufficient disparities existed "between cumulated data and German data for those factors which Commissioner Nuzum deemed most relevant in reaching an affirmative determination." Thyssen's Mot. J. Agency R. at 47.

The thrust of Thyssen's argument however, is misguided. Thyssen argues that based on the statutory threat factors, Canada is more of a threat of material injury than Germany, thus Commissioner Nuzum erred in cumulating German imports. Commissioner Nuzum, however, in exercising her discretion to cumulate, based her decision on a limited number of factors. Most important of these was the fact that the cold-rolled countries that were cumulated exhibited significant adverse price effects. On this basis, Canada was not cumulated. *See* discussion of Canada, *supra*, at pp. 37–40. Germany, on the other hand, had a majority of underselling and declining price trends. *Final Det.* at 133–34. Thus, the court finds that Commissioner Nuzum reasonably exercised her discretion in cumulating German imports.

Thyssen also challenges Commissioner Newquist's affirmative threat finding for Germany, contending that his findings are not supported by substantial evidence on the record. First, Thyssen's challenge to Commissioner Newquist's consideration of the capital markets is rejected. *See* discussion of Korea, *supra,* at pp. 46–48. Second, Thyssen's challenge to Commissioner Newquist's affirmative threat determinations for the cumulated imports is made on much the same grounds as Dongbu's (Korea). In its discussion concerning Korea, the court found that Commissioner Newquist's affirmative threat determination with regard to the cumulated countries, including Germany, was supported by substantial evidence. Thyssen's arguments do not compel a different result. Based on the record taken as a whole, the court finds the affirmative threat determination for Germany by Commissioners Nuzum and Newquist to be supported by substantial evidence in the record.

## CONCLUSION

In conclusion, petitioners have failed to demonstrate prejudicial error as to the negative aspects of the Commission's injury determination. The findings are supported by substantial evidence and are sustained. The Commission's affirmative threat determinations for Korea, The Netherlands and Germany are similarly supported and are sustained.